UNITED STATES, Appellee,

v.

Private E1 Dwight J. LOVING,
065–56–0228, United States
Army, Appellant.

ACMR 8901123.

U.S. Army Court of Military Review.

3 Feb. 1992.

Reconsideration Denied 5 March 1992.

For Appellant: Captain Emmett G. Wells, JAGC (argued), Colonel Robert B. Kirby, JAGC, Captain Ralph L. Gonzalez, JAGC, Captain James K. Lovejoy, JAGC (on brief).

For Appellee: Major Joseph C. Swetnam, JAGC (argued), Colonel Dayton M. Cramer, JAGC, Captain Timothy W. Lucas, JAGC, Captain Jonathan F. Potter, JAGC (on brief).

Before De GIULIO, HAESSIG, and ARKOW, Appellate Military Judges.

## OPINION OF THE COURT

De GIULIO, Senior Judge:

Appellant was tried by a general court-martial composed of officers. Contrary to his pleas, he was found guilty of premeditated murder, felony murder, attempted murder and four specifications of robbery, in violation of Articles 118, 80, and 122, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 880, and 922 (1982) [hereinafter UCMJ]. He was sentenced to death, a dishonorable discharge, and forfeiture of all pay and allowances. The convening authority approved the sentence.

Appellant asserts sixteen assignments of error and questions the appropriateness of the sentence. Several of the issues raised have been resolved by the Court of Military Appeals and will not be discussed in this

opinion. See *United States v. Curtis*, 32 M.J. 252 (C.M.A.), *cert. denied*, —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354, *remanded*, 33 M.J. 101 (C.M.A.1991).[1] We find no error that substantially prejudices appellant, find the sentence appropriate, and affirm the findings of guilty and the sentence.

The evidence at trial, consisting of appellant's confession, eyewitness testimony (except for the two murders), physical evidence, and other corroborating evidence unequivocally established appellant's criminal conduct on 11–13 December 1988. In December 1988, appellant purchased a .22-caliber pistol from another soldier. After the purchase, appellant said the pistol made him feel like "I was big ... and nobody mess with me no more." Despondent over what he perceived as a deteriorating relationship with his girlfriend and his lack of money to buy her Christmas presents, appellant decided to rob stores. On the evening of 11 December 1988, he entered and robbed at gunpoint a 7–Eleven convenience store in Killeen, Texas. During the course of the robbery, he fired two shots into the counter and soda fountain, which were behind the cashier. He obtained approximately $38.00 from this robbery. Among the currency obtained by appellant was a bill from which the serial number had been recorded by the store.

About an hour later, appellant entered another 7–Eleven store in Killeen, produced a pistol, and demanded money. When the cash register made beeping noises during the cashier's attempts to open it, appellant fired a bullet into the register. Appellant then pointed the pistol at the cashier and demanded she put the money in a paper bag. He grabbed the bag and ran out of the store, firing a round back into the store as he departed. Appellant took approximately $52.00 during this robbery. The serial number from one of the bills obtained by appellant had also been recorded by the store.

---

1. *Curtis* was decided after the original brief and assignment of errors on behalf of appellant were filed with this Court.

Dissatisfied with the meager amount of money he had obtained from the 7–Eleven robberies, appellant made the intentional and considered decision to rob taxicab drivers. On the night of 12 December 1988, appellant called for a taxicab to take him from a grocery store in Killeen to his barracks at Fort Hood. The driver of the taxicab was an Army private who was moonlighting for extra money. After entering the taxicab and after arriving at Fort Hood, appellant directed the driver to park in a dark secluded area behind the barracks. He produced a pistol, held the pistol to the driver's head, ordered the driver to shut off the car's motor and lights, and demanded all the driver's money. After replying "bullshit" to the driver's protests that he had surrendered all of the money, appellant shot the driver in the back of the head. While looking at the hole in the back of the victim's head and the blood "gushing out," appellant cocked the pistol and shot him in the back of the head again. The taxi driver died as a result of these gunshot wounds.

Appellant fled from the cab and went to his barracks room where he counted the money. Disappointed at the small amount of money he had obtained, appellant immediately called for a taxicab to be dispatched to Fort Hood. After entering the cab, appellant directed the driver, a retired Army sergeant, to a dark secluded street in Killeen. He pointed his pistol at the driver, told him to turn off the lights and the motor, and demanded money. The driver surrendered a grey money pouch and a red wallet. Appellant ordered the driver to lay down on the seat. He then shot the driver in the head, killing him.[2]

Later that evening, appellant took his girlfriend, Nadia, to a nightclub in Killeen. At about 0100 on 13 December 1988, a taxicab driver took appellant and Nadia to the vicinity of Nadia's house. Appellant decided to rob the taxi driver. Appellant told Nadia to go home because he was going to the store to get toilet paper or cigarettes.[3] Nadia exited the taxicab. Appellant produced a pistol and directed the driver to a dark secluded street. Appellant told the driver to shut off the lights and engine. While holding the pistol to the driver's neck, he demanded money. The driver gave him about $94.00 of cab money, his coin changer, and his wallet. Appellant then jerked the driver's head around and ordered him to open his mouth. Believing he was going to be killed, the taxicab driver grabbed the pistol turning it away from his head as it was fired. Appellant bit the driver's hand. In the ensuing struggle, appellant pulled the driver into the back seat, trying to get the gun away from him. The driver turned the pistol on appellant and pulled the trigger, but the pistol would not fire. Appellant told the driver that the pistol only contained blanks. The driver, still in possession of the pistol, cocked it and attempted to shoot appellant; again, the pistol would not fire. Realizing that the pistol would not fire, the driver got out of the taxicab. As the driver exited the taxicab, appellant viciously bit the driver on the head and on the back. Two of the three bites caused permanent scarring. The driver broke away and started running. As appellant pursued him, the driver "hit him in the gut" with his elbow. The driver then safely fled the scene. Appellant ran back to Nadia's house and hid the gun behind the house.

Using information from the taxicab driver, criminal investigators were able to contact Nadia who identified appellant. Appellant was apprehended. The investigators took from appellant the third driver's wallet and the two bills from the 7–Eleven stores from which the serial numbers had been recorded. Among matters seized in a consent search of Nadia's house were the pistol found wrapped in a paper bag behind the house, .22–caliber bullets which were found in a drawer with appellant's uni-

2. The next day appellant threw the wallet into the garbage at his unit and the money pouch into the garbage at a local grocery store. These items were later recovered after appellant directed authorities to their location.

3. Nadia testified appellant was to buy cigarettes. In his confession, appellant stated he was to get toilet paper. We view this discrepancy as insignificant.

forms, .22–caliber bullets and casings which were found in a garbage can in the house, and appellant's bloodstained jacket.

In two confessions, one to the Army Criminal Investigation Command (CIC) agents[4] and one to the local authorities, appellant admitted the commission of each offense and described them in detail.

Trial defense counsel attempted to paint a picture of appellant as a poor inner-city kid who was raised in a rough neighborhood without the guidance of a father. He attempted to present appellant as a soldier who performed well in the military under strong leadership but got into trouble when that leadership was absent. He attempted to portray Nadia as an immigrant who was in trouble with the Immigration and Naturalization Service, needed to get a "green card" in order to stay in the United States, and used appellant to get money for her support and to fund necessary trips to New York City to settle her immigration problems.[5] He attempted to portray Nadia as a "gang leader," who was instrumental in getting appellant to commit the offenses. In an effort to do this, appellant called Nadia as a defense witness. She testified that she was born in Milan, Italy. She went to Germany, met an American, followed him back to the United States, and married him. After they moved to New York, they separated, and she went to Killeen, Texas. Her immigration paperwork had been transferred to New York and she was having difficulty getting her "green card" so she could remain in the United States. She obtained a job in a bar, and her father always sent her money. She never wanted or asked for any money from appellant. Shortly after she met the appellant, he began sleeping with her at her apartment. When appellant purchased the pistol, he showed it to her. She made him remove the pistol from her house because she didn't want a gun around the house.

At the time, Nadia did not know appellant intended to rob the stores. She learned of his crimes after he had committed them. At the request of appellant, she borrowed a friend's car and drove him to the vicinity of the two 7–Eleven stores which appellant robbed. Appellant made Nadia park some distance from the stores where she could not see them. On these occasions, she did not know where he had gone. Later, they used money provided by appellant to buy cocaine which they used. At some point, he told her that he had killed people to get money and showed her a red wallet, a zipper bag, and money. She did not believe him.

On the night of 12 December appellant and Nadia went to the Nubia Temple club where appellant had a jealous confrontation with another man over her. After appellant challenged the man to fight, a pistol fell out of appellant's pocket and discharged. Appellant and Nadia then left the club and took a taxicab, stopping at a 7–Eleven on the way to her apartment. When they neared her apartment, appellant stated he had forgotten her cigarettes and told her he would get them. At that time she noticed he had the pistol between his legs. Nadia got out of the taxicab and asked appellant to go with her. He refused. She walked home. He departed in the taxicab, returning a short time later. Later, she was approached by investigative agents and identified appellant as her boyfriend. She consented to the search of her house. It is Nadia's testimony which is the subject of appellant's first assignment of error.

## I.

■ Appellant asserts that the military judge improperly denied appellant's request to provide an accomplice testimony instruction regarding the testimony of Nadia. Appellant contends that:

---

**4.** This confession was recorded on video tape.

**5.** Although not a defense to appellant's crimes, defense counsel apparently presented these matters hoping that the court members would find appellant guilty of lesser offenses to the murder

specification or in an attempt to achieve less than unanimous findings of guilty of those offenses. If successful, this tactic would have avoided imposition of the death penalty.

Although the instruction may not have gained appellant a finding of not guilty to any of the charges, the panel members' perception and understanding of Nadia's impact on appellant's actions were vital to appellant's ultimate goal on sentencing to prove to the members that he does not deserve to die for his crimes. The entire defense case relied upon its ability to demonstrate that appellant was motivated and encouraged to commit those offenses by Nadia. By denying appellant's request for an accomplice instruction, the military judge effectively derailed appellant's entire theory of defense with respect to the ultimate issue of whether appellant deserves to die for his offenses.

■ The test to be applied in determining if a witness is an accomplice is whether the witness could be convicted of the same crime for which the accused is being prosecuted. *United States v. McKinnie*, 32 M.J. 141, 143 (C.M.A.1991); *United States v. Scoles*, 33 C.M.R. 226, 231 (C.M.A.1963). At trial, appellant's counsel requested an accomplice instruction as to Nadia. He pointed to her personal relationship to appellant, her need for money, her driving the car to the vicinity of the 7–Eleven stores, the physical evidence found at her home, and letters sent to appellant while he was confined which defense counsel claimed tended to suggest that she wished him to hide her involvement.[6] This Court views the evidence as the military judge did. Appellant's confession and Nadia's testimony show that Nadia did not know of the crimes until after they were committed. Even then, she did not believe appellant committed them. The evidence presented at trial does not implicate her in the crimes. There is no basis to charge her with any of them,[7] let alone convict her of them. *See McKin-*

*nie*, 32 M.J. at 143. The military judge's denial of the request for the accomplice instruction was correct.

## II.

A part of appellant's second assignment of error also arises from Nadia's testimony. Appellant alleges, in general, that the military judge's failure to grant appellant's motion for mistrial for cumulative error deprived him of a fair and impartial proceeding. Appellant divides this assertion into two parts: that the military judge failed to recuse himself for bias against appellant upon defense motion, and that the military judge failed to grant a motion for mistrial based upon an allegation that he commented upon the viability of the defense theory of the case in front of the members. These will be discussed in inverse order.

■ The defense contention at trial was that Nadia was a manipulative sinister force who directed appellant's criminal activities; or, in the alternative, her presence and influence over appellant and the overall circumstances of the offenses were such as not to warrant capital punishment of appellant. In an attempt to establish a basis for this theory, Nadia was called by the defense. In his direct examination of Nadia, trial defense counsel used leading questions. Eventually, trial counsel objected and that objection was sustained. Trial defense counsel contended that Nadia was an adverse witness because she provided information against appellant, and therefore the defense should be able to ask leading questions.[8] Even though the military judge cautioned trial defense counsel not to lead his witness, counsel continued to do so throughout Nadia's testimony. Only when trial counsel again objected did the military judge direct that leading ques-

---

**6.** The referenced letters are merely love letters. It takes great imagination to give them this sinister interpretation.

**7.** Upon cross-examination by trial defense counsel, a local policeman testified that there was no evidence upon which to charge Nadia and that no charges had been filed against her.

**8.** This information appears to have been her statement to investigators that appellant was her

boyfriend, and that he was a passenger in the taxicab. It is evident from the record that Nadia was reluctant to implicate appellant. She provided those statements to police each containing more information relating to appellant's criminal conduct. It is clear that she did what she could to protect appellant without getting herself into trouble.

tions not be asked. After trial defense counsel was told several times that the witness was not hostile and not to lead the witness, the following colloquy occurred before the court members:

DC: Your Honor, I would, again, request the Court's permission to allow me to cross-examine this witness, she is clearly adverse to my client—

MJ: No—absolutely ridiculous. Proceed.

. . . .

DC: Your Honor, I would like to ask the following question, to prove that this—at least, from the government's position—is the key witness against my client. The testimony that I seek to elicit from her is that they told her that she was the key witness in the case against Dwight Loving; which makes her—in the defense view—an adverse witness to my client.

MJ: I told you that was ridiculous, before. How many times have I gotta tell you it's ridiculous? The objection is sustained.

DC: Yes, sir.

MJ: Don't challenge me.

DC: Yes, sir. We will—we would like to submit a written brief, on this, at a later date, if we could, to make sure that we note all the objections we have.

MJ: No.

DC: No.

MJ: You've entered your objections—

DC: Alright—

MJ: —I have listened to your objections—three or four times—I have sustained; and, you're not going to ask any leading questions.

DC: Yes, Sir.

MJ: So, please, drive on.

DC: We feel this—

MJ: You open your mouth about it, again, counsel, and I'm going to clear the courtroom and we're going to have a discussion.

Subsequently, in an Article 39(a) session, after again litigating whether Nadia was an adverse witness, trial defense counsel objected to the military judge's response before the court members as "possibly prejudicial." Defense counsel moved for a mistrial on the basis that Nadia was a key witness to the defense and that the military judge's comments concerning the defense contention that she was an adverse witness as "ridiculous" and "absolutely ridiculous" prejudiced appellant and denied him a fair trial. The military judge denied the motion. He agreed with trial counsel that an instruction could cure any possible error. The military judge offered to provide a curative instruction to the court members in appropriate language fashioned by the defense. Defense objected to an instruction because it would be a "red flag" to the court members. Based upon defense desires, the military judge did not immediately instruct the court to disregard any comments but determined that he would give the members a general instruction to disregard any of his comments, statements, and gestures which would seem to indicate an opinion on the guilt or innocence of the accused.

■ A mistrial is a drastic remedy and should be granted only when manifestly necessary to preserve the ends of justice. *United States v. Garrett,* 24 M.J. 413, 417 (C.M.A.1987); *United States v. Jeanbaptiste,* 5 M.J. 374 (C.M.A.1978). Whether to grant a mistrial is within the discretion of the military judge, and his decision will not be disturbed unless there is a clear abuse of discretion. *United States v. Rushatz,* 31 M.J. 450, 457 (C.M.A.1990); *Jeanbaptiste,* 5 M.J. at 376. "Giving a curative instruction, rather than declaring a mistrial, is the preferred remedy for curing error when the court members have heard inadmissible evidence, as long as the curative instruction avoids prejudice to the accused." *United States v. Balagna,* 33 M.J. 54, 56 (C.M.A.1991) (citing *United States v. Evans,* 27 M.J. 34, 39 (C.M.A.1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989)).

■ In the case before us, an immediate instruction would have cured any possi-

ble error.[9] The military judge offered to give an immediate instruction to disregard his comments but, at appellant's request, did not do so. By requesting that no instruction be given, appellant waived the issue. *See United States v. Wray,* 9 M.J. 361 (C.M.A.1980). Notwithstanding the appellant's waiver, later, during instructions before findings, the military judge instructed the court members to disregard his comments, statements, or gestures. "Absent evidence to the contrary, a jury is presumed to have complied with the judge's instruction." *Balagna,* 33 M.J. at 56–57 (citations omitted). The military judge did not abuse his discretion in denying a mistrial.

 Appellant also alleges that a mistrial should have been granted because the military judge failed to recuse himself upon motion of defense for bias against appellant. This issue arose from appellant's request for expert psychiatric assistance. A Lieutenant Colonel (Dr.) W had been provided by the government, but defense contended he was inadequate. At an *ex parte* proceeding conducted with consent of the trial counsel, defense counsel disclosed to the military judge that Dr. W was inadequate because he refused to be a defense advocate, believed he should be neutral in providing advice to appellant, and felt that appellant was "the sort of person you might want to execute." The military judge took steps to insure that appellant was provided an acceptable psychiatrist. Finally, Dr. Armitage, a forensic psychiatrist acceptable to the defense, was made available. During this process the following colloquy concerning trial dates and accountability for delays took place:

TC: Your Honor, we're not—

MJ: Well, look—

TC: —opposing a defense delay, but I get the feeling that the government is being maneuvered here into somehow the defense saying, 'I'm not ready to go, we're going to need to evaluate a lot of different things; but somehow, it should all be accountable to the government.' And if it happens 90 days fall by, try to create an issue where there is no issue.

MJ: Well, that's my perception exactly. Certainly, you fellows aren't trying to maneuver the system, are you? If you want delay, I'd be more than happy to give you delay. If you want time to check out these things, be my guest; take whatever time you feel is necessary. But in my view so far, the government has been extremely cooperative with you. If you want more time, as I say, just ask.[10]

Subsequently, the appellant challenged the military judge for cause, bias, and prejudice against counsel for the defense. The military judge denied the motion.

 Appellant urges the application of the liberal standard applied to challenge of court members to the challenge of the military judge. We believe we should apply a different standard. There is a substantial burden on the defendant to prove that a judge is not impartial. *United States v. Martinez,* 19 M.J. 652 (A.C.M.R.1984). "A 'judge has as much obligation not to recuse himself when there is no reason to do so as

9. We doubt that the judge's conduct was error. This is not a case, such as *United States v. Wilson,* 2 M.J. 548 (A.C.M.R.1976), a case cited by appellant, where the military judge essentially tried the case for the prosecution. Military judges should take care not to voice their frustrations, such as the military judge did here, when counsel repeatedly raise objections to matters upon which the military judge has already ruled.

10. There was some confusion whether the military judge made comments at an Article 39(a), UCMJ, session or at an out of court session pursuant to Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 802 [hereinafter R.C.M.]. Although the use of R.C.M. 802 sessions has been expanded, the potential dangers of such sessions are exhibited by this case. Except for purely administrative matters, the use of R.C.M. 802 sessions should be discouraged. Matters which have even a remote possibility of becoming an appellate issue should be litigated on the record. In the case before us, appellant alleges statements made by the military judge at the 802 sessions exhibited his bias and prejudice against defense counsel. We have concluded from the record that those comments questioned by appellant took place at an Article 39(a) session and are part of the record of trial.

he does to recuse himself when the converse is true.'" *Martinez*, 19 M.J. at 653 (citing *United States v. Bray*, 546 F.2d 851, 857 (10th Cir.1976)). In the case before us, we find that the military judge was impartial and was not biased toward defense counsel. Indeed, he insured appellant had an acceptable expert and made many rulings in favor of appellant. We do not interpret his question of "Certainly, you fellows aren't trying to maneuver the system, are you?" as any indication of bias or, as contended by the defense; as an attack upon counsel's ethical conduct. *See United States v. Elzy*, 25 M.J. 416 (C.M.A.1988). We find no abuse of discretion and no error in the refusal of the military judge to grant appellant's challenge against him.

We find no cumulative error to support appellant's contention that failure to grant the motion resulted in an unfair trial. We hold that the military judge did not abuse his discretion in denying the motion for a mistrial. *See Jeanbaptiste*, 5 M.J. at 376.

### III.

■ Appellant submits that the military judge erred in failing to grant a motion for change of venue because of media coverage; or, in the alternative, the military judge erred in failing to sequester the panel members. At trial, appellant requested a change of venue to a place such as Fort Huachuca, Arizona, because the case received state and national publicity. In denying the motion the military judge made the following findings:

> One, the press has reported fairly and responsibly on this trial. Two, the stories have not created a shrill or hostile atmosphere for this trial. Three, the stories for the most part have been accurate, with a few minor exceptions cited by the defense. Any racial issues have not been injected by the press. Nevertheless, efforts have been made to ensure that the court members, named in the orders, have as little exposure to pretrial publicity as possible. Those efforts have included: One, obtaining members not assigned to the 1st ... Cavalry Division. Two, obtaining members assigned to Fort Hood well after the dates of the alleged incidents. Three, obtaining members from Fort Sill, Oklahoma, an installation hundreds of miles from Fort Hood. Four, an order issued by me on 31 January 1989, directing potential members to refrain from reading, listening to, or viewing any accounts of this trial, or the alleged incidents involved. And five, a previous ruling, allowing individually-sequestered voir dire.

After extensive voir dire of court-members, to include the issue of pretrial publicity and prior knowledge, nine members indicated they saw one newspaper article concerning the offense and five indicated they had seen references to the case on television. After the extensive voir dire, no reason was disclosed upon which to base a challenge for cause. Indeed, none of the members were challenged for cause by appellant because of media publicity or knowledge of the case.

■ Where an accused can demonstrate that the court would be adversely influenced by an atmosphere of hostility or partiality against him at place of trial, he is entitled to be tried in a different place. *United States v. Nivens*, 45 C.M.R. 194, 197 (C.M.A.1972). "A change in the place of trial may be necessary when there exists so great a prejudice against the accused that he cannot obtain a fair and impartial trial." R.C.M. 906(b)(11) discussion. As stated in *United States v. Smith*, 1 M.J. 1204, 1207–08 (N.C.M.R.1977),

> Proof that a particular case has been widely publicized, standing by itself does not establish that a court-martial has been influenced by such publicity. Further, the mere fact that court-martial members have heard or read about the case they are assigned to try, standing alone, is not a sufficient basis for a change of venue so long as the members will not be influenced by what they have heard or read.

(citations omitted).

In the case before us, we find that there was no atmosphere of hostility surrounding the court-martial. Further, the military judge took appropriate measures to ensure

the members remained free from possible external influence. As a result, we are satisfied that the court members decided the case based upon what was properly presented to them during the trial. *See United States v. Garwood*, 20 M.J. 148, 152 (C.M.A.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 456 (1985). We find that appellant was tried by a fair and impartial court. The military judge properly denied the motions for change of venue and sequestration of the members.

## IV.

■ Appellant asserts that the military judge improperly denied a defense motion to have the members ignore a portion of the government argument requesting that the members vindicate society's victims. Appellant's objection relates to the following argument by trial counsel on sentence:

> What the defense has glossed over in their entire argument is justice. What sentence serves justice? Crimes, when they're committed, demand punishments that fit them. The message that you send out, and you will send out a message with your sentence today, that message is not going to go just over this installation, but it is going to go across the United States. There's going to be a message that's going to be heard by working people. They need to know that they will not be terrorized in their work places. Americans, members of society, need to know that they will be protected and that they will be protected and that we will protect and we will vindicate society's victims.

Trial defense counsel objected to the argument. The military judge overruled the objection. The military judge instructed the court to consider evidence in aggravation and mitigation. He also instructed the court on the sentencing factors of protec-

tion of society from the wrongdoer, punishment of the wrongdoer, rehabilitation of the wrongdoer, preservation of good order and discipline in the military, and deterrence of the wrongdoer and those who know of his crime. Trial defense counsel objected to the instruction claiming specific deterrence should be prohibited.

Before this Court, appellant contends that trial counsel improperly argued general deterrence, citing *United States v. Mosely*, 1 M.J. 350 (C.M.A.1976). In *Mosely*, Judge Cook, writing for the Court, held that, "as applied to the accused, therefore, consideration of [specific] deterrence in assessment of a just sentence is consistent with the concept that the sentence should be individualized, that is, predicated on factors relevant to the accused." *Id.* at 351. He held, however, that it was error for the trial counsel to argue general deterrence. *Id.* The court withdrew from this view in *United States v. Lania*, 9 M.J. 100 (C.M.A.1980). The Court held that general deterrence is a relevant factor in determining a just sentence within the maximum limits prescribed and can be argued by the trial counsel, provided the military judge instructs the court there are other factors such as rehabilitation of the accused, and admonishes the court members that they must take into account the circumstances of the case and the character and propensities of the accused.[11] *Id.* at 104.

■ In the case before us, the military judge properly instructed the court members to take into account the circumstances of the case and the character and propensities of the accused. The trial counsel's argument did not invite the members to rely on deterrence to the exclusion of other factors. *See United States v. Thompson*, 9 M.J. 166 (1980). The trial counsel's argument was not improper. The military judge correctly overruled the objection.

---

**11.** Judge Cook, who authored *Mosely*, concurred in the disposition of *Lania*. In his concurrence he stated:

> I have expressed that view in a number of cases, but see no purpose in continuing its reiteration in the face of the Court's withdrawal from *United States v. Mosely*, 1 M.J. 350 (C.M.A.1976). I therefore, do not now,

and will not henceforth, raise objection to arguments by trial counsel for a more severe sentence than might otherwise be adjudged because increased severity may be thought, by the court members, to deter others from committing the same offense.

*Lania*, 9 M.J. at 105.

## V.

■ Appellant asserts that the record before us is insufficient to satisfy the requirement for a verbatim record.

At trial, the military judge gratuitously invited trial defense counsel to make an opening statement during the sentencing proceedings.[12] The court recessed before the "opening statement" could be presented by the trial defense counsel. The court was called to order and the "opening statement" on sentencing was presented. Trial defense counsel requested a sidebar conference and this colloquy followed:

DC: Your Honor, the tape didn't—didn't catch the opening statement part—

RPTR: I was in the restroom, Your Honor. I didn't know—

MJ: What?

DC: He was in the restroom, so he didn't get that. But it was—it was short—we don't think there was any error in that. It was a very short statement, and we don't see that as any serious error, but I thought we ought to bring it up at this time.

MJ: I didn't even notice.

DC: I didn't either.

MJ: Don't do that again, will you?

RPTR: I just went to the bathroom, and—

MJ: Yeah, I know, but don't do it again.

DC: I just thought we ought to do—say something on the record.

DC: I can recreate it verbatim, almost, and that—to the defense's satisfaction, Your Honor.

DC: Yeah.

The record reflects that the court reporter was absent two minutes. Trial defense counsel provided a text of his opening statement in writing which is attached to the record as an appellate exhibit.

Appellant urges that this Court adopt a bright line rule requiring a verbatim record such as that adopted by the Navy court in

*United States v. Alston,* 30 M.J. 969 (N.M.C.M.R.1990). The facts of *Alston* are far from the facts in the case before us. In *Alston,* only those parts of the record pertaining to the offenses of which appellant was convicted were transcribed. Government counsel maintained that the other parts were insubstantial. The court held that the record was not verbatim. *Id.* at 971.

■ A record of trial in a case such as the one before us must include a verbatim transcript of all sessions except sessions closed for deliberations and voting. *See* R.C.M. 1103(b)(2)(B). "A verbatim transcript includes sidebar conferences, arguments of counsel, and rulings and instruction by the military judge." R.C.M. 1103(b)(2)(B) discussion. Failure to comply with the rule does not necessarily require reversal but raises a presumption of prejudice which the government may rebut. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1103(b)(2) analysis, app. 21, at A21–70. *See United States v. Eichenlaub,* 11 M.J. 239 (C.M.A. 1981). An omission must be substantial to raise the presumption. *United States v. Gray,* 7 M.J. 296, 297 (C.M.A.1979); *see United States v. Nelson,* 13 C.M.R. 38 (C.M.A.1953). Conversely, insubstantial omissions do not change a record's characterization as a verbatim transcript. *United States v. McCullah,* 11 M.J. 234, 236 (C.M.A.1981); *United States v. Donati,* 34 C.M.R. 15 (C.M.A.1963). Therefore, reconstruction by trial counsel without defense participation of twenty-four pages of the testimony from five defense witnesses and proceedings on a motion for mistrial which originally consisted of about eighty pages has been held to be a substantial omission. *United States v. Boxdale,* 47 C.M.R. 351 (C.M.A.1973). On the other hand, reconstruction of a prosecution witness' testimony at an Article 39(a) session with all parties present has been held to be sufficient.

---

**12.** Military criminal trials are bifurcated, i.e., a proceeding before findings of guilty or verdict and a presentencing proceeding. Although an opening statement is normal at the beginning of trial on the merits, this Court is unaware of any other military case where an opening statement was permitted during presentencing proceedings. We need not determine the propriety of adding this additional but unrequested opening statement. In our view, however, the better practice is to follow established procedure.

*United States v. Lashley,* 14 M.J. 7 (C.M.A. 1982).

In the case before us, we find that the omission of a two-minute opening statement at the beginning of the sentencing procedures by trial defense counsel was not substantial. Trial defense counsel continued to present his evidence and placed his position concerning sentencing before the court during argument. Even assuming the omission was substantial, trial defense counsel's assurance to the military judge that he could reconstruct his statement "verbatim almost," and his reconstruction, which is attached to the record as an appellate exhibit, convinces this Court that the record is substantially verbatim. The requirements of the Manual for Courts–Martial and the Uniform Code of Military Justice have been satisfied and any possible presumption of prejudice has been overcome. *See Lashley,* 14 M.J. at 9.

### VI.

Appellant alleges that the death penalty provision of Article 118, UCMJ, is unconstitutional as it relates to traditional common law crimes that occur in the United States during time of peace. Appellant's claim is that the death penalty provision of Article 118 is an improper invasion of state interests protected by the tenth amendment to the Constitution and exceeds the requirements of the necessary and proper clause. The constitutionality of the peacetime prosecution of offenses under the military murder statute was upheld in *United States v. Schafer,* 32 C.M.R. 83 (C.M.A.1962). We believe the reasoning in *Schafer* is similarly applicable to this case:

Thus, in the case of an accused serving in the armed forces, there is no merit to the defense argument insofar as it is predicated on drawing a distinction as to peacetime offenses. *See also Ex parte Milligan,* [71 U.S.] 4 Wall. 2, 124, 141 [18 L.Ed. 281] (U.S. 1866). And neither, of course, can the locus of the crime, nor the penalty therefor, make any differ-

ence, for those amenable to military justice under Article 2 of the Code, 10 U.S.C. § 802, are subject thereto in all places under the clear extraterritorial applicability prescribed for the Uniform Code in Article 5 thereof, 10 U.S.C. § 805. As the Supreme Court of the United States recently held in *Kinsella v. United States,* 361 U.S. 234, 4 L.Ed.2d 268, 80 S.Ct. 297 (1960):

'The test for jurisdiction, it follows, is one of *status,* namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'

. . . .

'[T]he power to 'make Rules for the Government and Regulation of the land and naval Forces' bears no limitation as to offenses. The power there granted includes not only the creation of offenses but the fixing of the punishment therefor. If ... [the accused] are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses.'[13]

*Schafer,* 32 C.M.R. at 85–86.

The assertion of error is without merit.

### VII.

Appellant challenges the peremptory challenge procedure in the military justice system, contending that it allows the government to remove any one juror without cause and constitutes an unconstitutional violation of the fifth and eighth amendments in capital cases. Appellant further contends that a peremptory challenge permits the prosecutor to remove a member whose moral bias against the death penalty does not justify a challenge for cause. Although appellant makes this broad assertion, his argument is not directed at death penalty cases specifically, but at the peremptory challenge procedure in general. He contends that the convening authority selects the "best qualified" to sit as court members and that the one peremp-

---

**13.** This view has been reinforced by *Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987).

tory challenge is to remove any lingering doubt about a member's fitness to serve. Appellant uses as an example a situation where a defense challenge for cause is denied and the issue is closely decided. He contends that only then is a peremptory challenge proper. But where a peremptory challenge is made by the government without first challenging the member for cause, he contends no valid basis exists for the member's removal from the court. Appellant cites no authority for this unique conclusion.

Article 41(b), UCMJ, provides that "Each accused and the trial counsel is entitled to one peremptory challenge, but the military judge may not be challenged except for cause." No reason is necessary for a peremptory challenge. R.C.M. 912(g)(1) discussion.[14]

At common law, unlimited peremptory challenges were exercised by the Crown and the defendant was allowed a limited number.[15] Originally, peremptory challenges may have been allowed only in capital felonies. *See Swain*, 380 U.S. at 212 n. 9, 85 S.Ct. at 831 n. 9. "The persistence of peremptories and their extensive use demonstrate the long and widely held belief that the peremptory challenge is a necessary part of trial by jury." *Swain*, 380 U.S. at 219, 85 S.Ct. at 835. It has been said that the peremptory challenge is an arbitrary and capricious right which must be exercised with full freedom or it fails in its purpose. *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). "Although historically the incidence of the

prosecutor's challenges has differed from that of the accused, the view in this country has been that the system should guarantee not only freedom from any bias against the accused, but also from prejudice against the prosecution." *Swain*, 380 U.S. at 220, 85 S.Ct. at 835. In the case before us, we find that the trial counsel's peremptory challenge served that very purpose. We hold that the prosecution's peremptory challenge did not violate the Constitution.[16]

### VIII.

Appellant next asserts that R.C.M. 1004 violates his fifth amendment right to equal protection by subjecting him to the death penalty for an offense which is not punishable by death under the federal criminal code. This Court addressed this issue in *United States v. Murphy*, 30 M.J. 1040, 1055–1056 (A.C.M.R.1990) (en banc), holding that an accused was not deprived of equal protection by virtue of his status in the armed forces. We see no valid reason to reject our prior holding on this issue. Appellant's assertion of error is without merit.

### IX.

■■■ Appellant contends that due process requires that trial and intermediate appellate judges in a peacetime military death case have the protection of a fixed term of office.

No published case by this Court has addressed this issue.[17] In obiter dictum, the

---

**14.** This provision has been limited by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *United States v. Moore*, 28 M.J. 366 (C.M.A.1989); *United States v. Santiago–Davila*, 26 M.J. 380 (C.M.A.1988).

**15.** For a history of the peremptory challenge see *Swain v. Alabama*, 380 U.S. 202, 212–217, 85 S.Ct. 824, 831–834, 13 L.Ed.2d 759 (1965). In citing *Swain*, we recognize the limitations placed upon the case by *Batson*.

**16.** In *Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887), the Supreme Court rejected a constitutional challenge under the equal protection clause to the prosecution's peremptory challenge. The Court stated, "The right to challenge is the right to reject, not select a juror. If from those who remain, an impartial jury is

obtained, the constitutional right of an accused is maintained." *Id.* at 71, 7 S.Ct. at 352. In the case before us, adopting appellant's contention would provide him a partial court—partial in his favor.

**17.** The issue of fixed terms of office has been addressed by this Court in an unpublished opinion, which held there was no requirement for a fixed term for judges in the military and thus no due process violation. *United States v. Durham*, CM 446440 (A.C.M.R.1986) (unpub.), *petition denied*, 24 M.J. 126 (C.M.A.1987). The Navy–Marine Corps Court of Military Review has subsequently reached the same conclusion. *United States v. Graf*, 32 M.J. 809 (N.M.C.M.R.1990).

Supreme Court stated, in *Palmore v. United States*, 411 U.S. 389, 404, 93 S.Ct. 1670, 1679, 36 L.Ed.2d 342 (1973):

> Under its ... power '[t]o make Rules for the Government and Regulation of the land and naval Forces,' Congress has declared certain behavior by members of the Armed Forces to be criminal and provided for the trial of such cases by court-martial proceedings in the military mode, not by courts ordained and established under Article III. Within their proper sphere, courts-martial are constituted to carry out congressional and executive will. *Dynes v. Hoover,* [61 U.S.] 20 How. 65, 79, 82 [15 L.Ed. 838] (1857).... [T]he Constitution does not provide life tenure for those performing judicial functions in military trials. *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955).

Although the establishment of a fixed term of office for those performing military judicial functions may be desirable, it is not a Constitutional requirement, but is a policy matter to be determined by the President, Congress, or each military service.

### X.

▪ Upon sentencing appellant, the court members unanimously found the following three aggravating factors:

> The premeditated murder of Bobby Gene Sharbino was committed while the accused was engaged in the commission or attempted commission of a robbery.

> Having been found guilty of the felony murder of Christopher Fay, as set forth in Specification 3 of Charge I, the accused was the actual perpetrator of the killing.

> Having been found guilty of premeditated murder of Bobby Gene Sharbino, the accused was also found guilty of another

violation of Article 118, UCMJ, in the same case.

The court members also announced that they unanimously found any extenuating and mitigating circumstances were substantially outweighed by any aggravating circumstances. Accordingly they sentenced appellant, *inter alia,* to be put to death.

In accordance with our obligation under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have independently weighed the evidence and agree with each of the aggravating factors found by the court-martial, i.e., that the premeditated murder of Bobby Gene Sharbino, in violation of Article 118(1), UCMJ, was committed while appellant was engaged in a robbery (R.C.M. 1004(c)(7)(B)); that in the felony murder of Christopher Fay, a violation of Article 118(4), the appellant was the actual perpetrator of the killing (R.C.M. 1004(c)(8)); and that appellant was found guilty in the same case of another violation of Article 118 (R.C.M. 1004(c)(7)(J)). We find that each aggravating factor in this case, standing alone, is sufficient to authorize the death penalty. *United States v. Curtis,* 33 M.J. 101, 108 (C.M.A.1990). Accordingly, we do not find that the number of aggravating factors affected the court members willingness to impose the death sentence. *See id.* We also find that any extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances.

In accordance with *Curtis,* we are required to conduct a limited proportionality review using *generally* similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes. 33 M.J. at 109. We have examined a number of those cases and have concluded that the sentence is generally proportional to those imposed by other jurisdictions in similar situations.[18] We also conclude that the

---

18. A computer search was used to examine cases reviewed by the Supreme Court since the reinstatement of the death penalty following *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Among the cases examined were *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Walton v.*

*Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); and *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

sentence is appropriate for the crimes of which the accused stands convicted.

## XI.

In a supplemental assignment of error, appellant alleges that the military judge erred in not permitting him to plead guilty or enter into a confessional stipulation to the robberies of the murder victims. A reading of the record reveals that appellant raised this issue in motions regarding referral of the charges to trial and multiplicity. In regard to the multiplicity motion, appellant initially offered to admit to the fact in an attempt to counter trial counsel's argument that exingencies of proof required multiplicious pleading. Subsequently, appellant decided, however, "to hold our water" on the offer. In regard to the confessional stipulation, that issue became moot when trial counsel steadfastly refused to enter into such a stipulation. The question of whether appellant could plead guilty was also discussed just prior to pleas. The cause of this discussion was case law which held that, under Article 45(a), UCMJ, 10 U.S.C. § 845(a),[19] an accused could not plead guilty to robbery and unpremeditated murder, even when charged in separate specifications and even when felony murder was not charged. *See United States v. Dock,* 28 M.J. 117, 118 (C.M.A.1989).

█ Unlike *Dock,* appellant here complains he was precluded from pleading guilty. A reading of the record reveals that appellant did not attempt to enter pleas of guilty to any offense. Although he could have entered pleas of guilty to some offenses, he elected not to do so, as was his right. It appears from the record that appellant's strategy at trial was to plead not guilty, put the government to its proof, and attempt to shift the blame for the offenses to Nadia. Appellant's complaint at trial seemed to have been that he was deprived on sentencing of the instruction that a plea of guilty is the first step toward rehabilitation. Addressing this is-

sue, the military judge offered to instruct the court that appellant was precluded from pleading guilty to capital offenses by law. Appellant assented to the offer, *sub silentio.* The military judge so instructed the court. Appellant must have been satisfied with the instruction because he did not object to it. Having selected this strategy, appellant should not be heard to complain of it. Even assuming error, appellant was not prejudiced, for he received the best of both worlds—he pleaded not guilty and the members received an instruction which left the impression that he really wanted to plead guilty but could not because of the law. We find the assignment of error without merit.

Other assertions of error, to include those raised personally by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), are without merit. The findings of guilty and the sentence are affirmed.

Judges HAESSIG and ARKOW, concur.

---

**19.** Article 45(a), UCMJ, precludes an accused from entering a plea of guilty to any offense for

which the death penalty may be adjudged.