Dwight J. LOVING, Private
U.S. Army, Petitioner

v.

UNITED STATES, Respondent

No. 06-8006

Crim. App. No. 19891123

United States Court of Appeals for the Armed Forces

Argued October 29, 2008

Decided July 17, 2009

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and BAKER, J., joined.  EFFRON, C.J., filed a
separate concurring opinion.  STUCKY, J., filed a separate
opinion concurring in part and in the result.  RYAN, J., filed a
separate dissenting opinion.

Counsel


For Petitioner:  Teresa L. Norris, Esq. (argued); Lieutenant
Colonel Mark Tellitocci and Captain William J. Stephens (on
brief).

For Respondent:  Captain Adam S. Kazin (argued); Colonel Denise
R. Lind, Lieutenant Colonel Steven P. Haight, and Lieutenant
Colonel Mark H. Sydenham (on brief).

Amicus Curiae for Petitioner:  Michelle M. Lindo McCluer, Esq.,
Jonathan E. Tracy, Esq., Eugene R. Fidell, Esq., and Stephen A.
Saltzburg, Esq. (on brief) -- for the National Institute of
Military Justice.

Military Judges:  Stephen V. Saynisch (trial) and Theodore E.
Dixon (DuBay hearing)


**This opinion is subject to revision before final publication.**

Judge ERDMANN delivered the opinion of the court.

Private Dwight J. Loving was convicted in 1989 of premeditated murder, felony murder, attempted murder, and several specifications of robbery. The court-martial sentenced Loving to a dishonorable discharge, forfeiture of all pay and allowances, and to be put to death. The United States Army Court of Criminal Appeals affirmed the findings of guilty and the sentence. United States v. Loving, 34 M.J. 956, 970 (A.C.M.R. 1992). We affirmed on direct review in 1994. United States v. Loving, 41 M.J. 213, 300 (C.A.A.F. 1994), modified by 42 M.J. 109 (C.A.A.F. 1995). The Supreme Court affirmed that decision in 1996. Loving v. United States, 517 U.S. 748, 774 (1996).

The case is now before us on Loving's petition for extraordinary relief in the nature of a writ of habeas corpus alleging that defense counsel provided constitutionally ineffective representation in the sentencing phase of his trial. Assuming without deciding that the performance of Loving's defense counsel was deficient as alleged, we conclude that Loving has failed to demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. We hold that Loving has failed to meet his burden to establish prejudice

2

<u>Loving v. United States</u>, No. 06-8006/AR

under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and deny

the petition for extraordinary relief in the nature of a writ of

habeas corpus.

BACKGROUND

1.  <u>Procedural Background</u>

When a court-martial sentence includes the death penalty,

the case remains pending in the military justice system through

five separate stages:  (1) action by the convening authority

under Article 60, Uniform Code of Military Justice (UCMJ), 10

U.S.C. § 860 (2006); (2) review by the appropriate Court of

Criminal Appeals under Article 66, UCMJ, 10 U.S.C. § 866, 10

U.S.C. § 866 (2006); (3) review by the United States Court of

Appeals for the Armed Forces under Article 67(a)(1), UCMJ, 10

U.S.C. § 867(a)(1) (2006); review by the Supreme Court under

Article 67a(a), UCMJ, 10 U.S.C. § 867a(a) (2006), if certiorari

is sought and granted as provided in 28 U.S.C. § 1259 (2006);

and (5) consideration by the President under Article 71(a),

UCMJ, 10 U.S.C. § 871(a) (2006).  A case does not become final

under the UCMJ until completion of all five stages.  <u>See</u> Article

76, UCMJ, 10 U.S.C. § 876 (2006).

In the present case, the United States Army Court of

Criminal Appeals affirmed the findings of guilty and the

sentence.  <u>Loving</u>, 34 M.J. at 970.  On direct review to this

court, we also affirmed the findings of guilty and the sentence.

3

Loving, 41 M.J. at 300.  In doing so, we considered, inter alia, Loving's ineffective assistance of counsel claim under Strickland, which included allegations that his defense counsel "failed to request funds for a mitigation specialist or to present a cohesive, comprehensible background, social, medical, and environmental history" during the sentencing phase of Loving's trial.  Id. at 249.  We determined that this claim lacked merit, holding that defense counsel's investigation and presentation of mitigation evidence and their decisions regarding use of expert testimony at sentencing were reasonable. Id. at 250.

The Supreme Court issued its decision affirming the death sentence on June 3, 1996, completing stage four of the five stage process under the UCMJ.  Loving, 517 U.S. at 774.  In the thirteen years since the Supreme Court's decision, the case has remained pending within the military justice system, awaiting presidential action.[1]  Loving's case remains in a posture where his military remedies have not been exhausted -- a critical component of any effort to obtain review in the Article III courts.  See Loving, 62 M.J. 248-51.  As a result, review in the Article III courts is not reasonably available to Loving so long

---

[1] A more detailed appellate history is documented in prior opinions.  See Loving v. United States, 64 M.J. 132, 134-36 (C.A.A.F. 2006); Loving v. United States, 62 M.J. 235, 238-39 (C.A.A.F. 2005); Loving v. Hart, 47 M.J. 438, 440 (C.A.A.F. 1998).

4

Loving v. United States, No. 06-8006/AR

as his case remains pending in the military justice system.  See id.

On February 18, 2004, prior to filing the present habeas petition, Loving sought relief from our court through a writ of coram nobis under the All Writs Act, 28 U.S.C. § 1651(a).  See id. at 236.  Among other allegations, relying on the intervening Supreme Court decision in Wiggins v. Smith, 529 U.S. 510 (2003), Loving argued that this court committed clear error during mandatory review of Loving's ineffective assistance of counsel in sentencing claim because the court did not focus on the investigative aspect leading to counsel's decisions.  Loving alleged that defense counsel's investigation was not reasonable and that counsel's deficient conduct was prejudicial in sentencing.

In the course of considering his coram nobis petition, we addressed the jurisdictional issues presented by the status of his case -- a case that remained pending in the military justice system after review by our court and the Supreme Court.  Loving, 62 M.J. at 239-46.  We specifically considered the implications of the relationship between cases pending in the military justice system and collateral review in the Article III courts. Id.

We concluded that a case pending final action under the UCMJ remained subject to extraordinary writ consideration by the

5

appellate courts in the military justice system.  Id. at 246.
We further concluded that a writ of error coram nobis was not
the proper vehicle for considering Appellant's claim because a
writ of habeas corpus under the All Writs Act remained
available.  Id. at 257.

At that time, we could have converted Loving's coram nobis
filings into a petition for habeas corpus, but we declined to
make that decision for him.  Id. at 259.  Instead, "mindful that
a habeas petition before this Court could affect Petitioner's
right and strategy to raise . . . the issues . . . . if
eventually filed in an Article III court," we dismissed
Appellant's petitions for extraordinary relief without prejudice
for Loving to file a writ of habeas corpus in our court, citing
Noyd v. Bond, 395 U.S. 683, 695 n.7 (1969).[2]  Id. at 256, 258-60.

---

[2] In Noyd, Justice Harlan, writing for the majority, discussed
the power of this court to issue a writ of habeas corpus under
the All Writs Act:

> Since the All Writs Act [28 U.S.C. § 1651(a)] applies
> by its terms to any "courts established by Act of
> Congress," and since the Revisers of 1948 expressly
> noted that "the revised section extends the power to
> issue writs in aid of jurisdiction, to all courts
> established by Act of Congress, thus making explicit
> the right to exercise powers implied from the creation
> of such courts," we do not believe that there can be
> any doubt as to the power of the Court of Military
> Appeals [now the Court of Appeals for the Armed
> Forces] to issue an emergency writ of habeas corpus in
> cases, like the present one, which may ultimately be
> reviewed by that court.  395 U.S. at 695 n.7; see also
> United States v. Denedo, 2009 U.S. LEXIS 4160, at *14,
> 2009 WL 1576568, at *5 (June 8, 2009) (recognizing

In so doing, we expressly alerted Loving to the potential effect of a habeas petition before our Court on future habeas petitions filed in the Article III courts.  Id. at 258-60 (citing, inter alia, 28 U.S.C. § 2244).

While the case remained pending within the military justice system, Loving had a number of options, including filing a habeas petition in our court or awaiting action by the President before seeking judicial review.  He elected to file a petition for writ of habeas corpus in our court.  Loving v. United States, 64 M.J. 132, 134 (C.A.A.F. 2006).

Loving filed his habeas petition with this court on February 2, 2006, raising essentially the same claim as to the trial defense team's constitutionally ineffective performance at sentencing that he raised in the previous coram nobis petition. Loving, 64 M.J. at 135.  In the course of considering the habeas petition, we focused on what standard of review to apply to a habeas corpus action under the All Writs Act with respect to a case that remained pending in the military justice system.  Id. at 144-46.  Taking into account the importance of deference to decisions made during direct judicial review, and recognizing

---

that when military appellate courts have subject-matter jurisdiction over the case or controversy, "military courts, like Article III tribunals, are empowered to issue extraordinary writs under the All Writs Act, Noyd v. Bond, 395 U.S. 683, 695, n.7 (1969)").

the limited scope of review under the All Writs Act, we adopted the highly deferential standard for collateral review used by other federal courts.  See id. at 145-46.  That restrictive standard requires us to determine:

> whether this Court's prior review:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [prior] proceeding.

Id. at 145 (citing 28 U.S.C. § 2254(d)) (alteration in original).

Applying that standard to the pending habeas petition, we observed in our prior decision that the factual record was inadequate.  Id. at 150-52.  Accordingly, we remanded for proceedings under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), which provides a well-established procedure for development of a post-trial evidentiary record, followed by return of the case to our court for further review.  Loving, 64 M.J. at 152-53.

In particular, we determined that in light of Wiggins, "we [did] not have the factual predicate to determine if our prior decision addressing the issue of ineffective assistance of counsel was correct under the Strickland standard."  Id. at 134. We ordered a DuBay hearing to address the issue of "whether

Petitioner's trial defense counsel 'chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible' thereby prejudicing Petitioner in the capital sentencing phase of the court-martial." Id. (quoting Wiggins, 539 U.S. at 527-28). We directed the DuBay judge to issue findings of fact and conclusions of law on several specific matters related to counsel's investigation into Loving's background. Id. at 152-53. We also directed the DuBay judge to reweigh the evidence adduced at trial and in the DuBay proceeding to determine whether there was a reasonable probability that the panel would have returned a different sentence if the new evidence had been presented at trial. Id. at 153.

The DuBay hearing has been completed and the record has been returned to this court for further review. At the DuBay proceeding, the parties had full opportunity to present witnesses, documentary evidence, and legal arguments. The military judge considered the evidence and arguments of the parties, applied the standard set forth in our prior opinion, and addressed the issues identified in our remand order. At the conclusion of the proceeding, the military judge issued a comprehensive decision detailing his factual findings and legal conclusions. In summary, the DuBay judge found that "a

reasonable investigation as required by St[r]ickland, as further explained in Wiggins, was conducted under the circumstances of this case.  PVT Loving's defense counsel did not choose to abandon their investigation at an unreasonable juncture."  The DuBay judge also concluded:

> [A]fter reweighing all of the evidence adduced at trial and considering the evidence presented in the DuBay hearing . . . had the panel been confronted with the evidence at issue, there is no reasonable probability that at least one member of the panel would have struck a different balance thereby not voting for a death sentence and the result of the sentencing proceeding would not have been different.

As a result of the standards and procedures adopted by our court, we now have before us a comprehensive record, developed by a military judge, which provides the precise framework necessary for effective and accurate habeas review.  The parties submitted additional briefs to this court and we held oral argument on October 29, 2008.[3]

_____

[3] We ordered briefing on two issues:

> I.   WHETHER THE RECORD OF THE EVIDENTIARY HEARING ORDERED PURSUANT TO UNITED STATES V. DUBAY, 17 C.M.A. 147, 37 C.M.R. 411 (1967), SHOULD BE RETURNED TO THE JUDGE ADVOCATE GENERAL OF THE ARMY FOR REMAND TO THE CONVENING AUTHORITY AND/OR THE ARMY COURT OF CRIMINAL APPEALS FOR REVIEW PRIOR TO REVIEW BY THIS COURT.

> II.  WHETHER PETITIONER'S WRIT OF HABEAS CORPUS SHOULD ISSUE IN VIEW OF THE FINDINGS OF FACT AND CONCLUSIONS OF LAW ENTERED BY THE MILITARY JUDGE IN THE DUBAY PROCEEDING ON THE QUESTION OF WHETHER THE TRIAL DEFENSE TEAM CONDUCTED A REASONABLE INVESTIGATION INTO POTENTIAL EVIDENCE

2.  Factual Summary and Current Allegations

On the night of December 11, 1988, Loving robbed two convenience stores at gunpoint.  Loving, 41 M.J. at 229.  He then robbed three cab drivers at gunpoint and killed two of the drivers after receiving money and other items.  Id.  He attempted to kill the third cab driver, but the victim struggled the gun away from Loving and fled the scene.  Id. at 229-31. Loving was apprehended the next day and advised of his rights. Id. at 230.  He waived his rights and confessed in a videotaped interview.  Id.

Three military defense counsels were detailed to Loving's case:  Captain William Ibbotson, Captain John Smart, and Major David Hayden.  All three met with Loving shortly after his apprehension.  On January 17, 1989, Hayden traveled to Loving's hometown of Rochester, New York, to conduct a background investigation.  As to the details of the trip, the DuBay judge found as follows:

> [Major Hayden] spent all of 18 Jan 89 (the whole day,
> and into the evening) and part of 19 Jan 89,

---

IN MITIGATION AND PROVIDED EFFECTIVE ASSISTANCE
OF COUNSEL AT SENTENCING.

67 M.J. 22 (C.A.A.F. 2008).  As to the first issue, both parties and amicus curiae argued that it was appropriate for us to address the underlying issues at this time without remand to the convening authority or the Court of Criminal Appeals.  We agree and turn directly to the second issue.

interviewing some family members, friends, and others (e.g., boxing coach, school teacher, Detective Verna[4]).

The purpose of the visit, according to MAJ Hayden, was "to find out information, as much information as I could about Dwight Loving's background." As suggested by CPT Ibbotson, he was also looking for evidence of impulsive behavior, as well as evidence of head trauma.

In Rochester, MAJ Hayden met with several of PVT Loving's family members including his mother, father, and some of PVT Loving's siblings. He learned more about PVT Loving's "upbringing" his "family structure" and his "relationship with his brothers and sisters."

MAJ Hayden learned "a lot" from his interview of Mr. Johnson, PVT Loving's childhood boxing coach. . . .

. . . .

As further preparation for trial, CPT Ibbotson conducted additional background investigation by telephone of PVT Loving's history prior to his military service. He spoke with PVT Loving's mother, four brothers, and his sister Gwendolyn. He also spoke by telephone with Detective Verna. . . .

In addition to these investigative efforts, CPT Ibbotson and CPT Smart also interviewed unit witnesses, Ms. Pessina [Loving's girlfriend], friends of Ms. Pessina, and confinement officers supervising Private Loving in pretrial detention.

In the habeas petition before us, Loving alleges ineffective assistance of counsel in the investigation and presentation of mitigation evidence related to Loving's background and social history. Loving faults defense counsel for failing to obtain the assistance of a mitigation specialist

---

[4] Detective Verna was an officer in the Rochester police department who had information about the rough neighborhoods in Rochester and problems with drugs and violence in the city.

or social worker. He also alleges deficiencies in the number of, approach to, and conduct of the background interviews that defense counsel conducted with Loving's family members and others, as well as deficiencies in the amount of social history records collected. Loving contends that the interviews were ineffective because defense counsel were looking for specific information in line with preconceived theories determined on the basis of their initial discussions with Loving and without the benefit of an open-ended investigation.

Loving also argues that during sentencing defense counsel only presented "skeletal information concerning Loving's background and environment that was wholly inadequate to present to the jury a true picture of his tortured life and the impact upon him." According to Loving, if "this true picture had been presented there is a reasonable probability that at least one juror would have struck a different balance in the sentencing determination."[5]

---

[5] In his habeas petition filed February 2, 2006, Loving also alleged that defense counsel failed to adequately investigate and to present evidence in mitigation related to Loving's intoxication and mental state at the time of the offenses. This contention was largely based on affidavits from Gerlinde Joseph and Beverly Sedberry, acquaintances of Loving at the time of the murders. Both individuals testified at the DuBay hearing, and the DuBay judge determined that neither their affidavits nor their respective testimony were credible or reliable. As Loving has not pursued this line of argument following the DuBay hearing and we see no clear error in the military judge's credibility rulings, we focus on the alleged deficiencies related to his family and social background.

INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

We consider claims of ineffective assistance of counsel under the two-prong test of Strickland. See Strickland, 466 U.S. at 687. First, Loving must show that counsel's performance was deficient. Id. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, Loving must show that the deficient performance prejudiced the defense. Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. We need not analyze the Strickland prongs in any particular order. As the Supreme Court stated:

> [A] court need not determine whether counsel's
> performance was deficient before examining the
> prejudice suffered by the defense as a result of the
> alleged deficiencies. The object of an
> ineffectiveness claim is not to grade counsel's
> performance. If it is easier to dispose of an
> ineffectiveness claim on the ground of lack of
> sufficient prejudice, which we expect will often be
> so, that course should be followed.

Id. at 697; see, e.g., United States v. Quick, 59 M.J. 383, 386 (C.A.A.F. 2004). Here we will assume without deciding that the performance of Loving's defense counsel was deficient as alleged for purposes of analyzing the prejudice prong of Strickland.

To establish prejudice under Strickland, Loving must show that "there is a reasonable probability that, but for counsel's

14

unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  In the context of this capital case challenging the death sentence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.  The question is whether if the members had been able to place the additional evidence "on the mitigating side of the scale, there is a reasonable probability that at least one [member] would have struck a different balance." Id. at 537.

In this case, we undertake this prejudice review de novo. Under the standards of 28 U.S.C. § 2254(d), a habeas review of a constitutional claim would normally employ a deferential review of the challenged decision.  See Bell v. Cone, 535 U.S. 685, 698-99 (2002).  However, we did not reach the prejudice prong of Strickland in our 1994 direct review of this case.  See Loving, 41 M.J. at 250.  Consequently, our review is not circumscribed by any previous conclusions of this court.  See Wiggins, 539 U.S. at 534.  Nor is our review impacted by the DuBay judge's conclusion on prejudice, which we also review de novo.  See United States v. Davis, 60 M.J. 469, 473 (C.A.A.F. 2005).

We have carefully reviewed the totality of the evidence -- both that adduced at trial and the evidence adduced in the DuBay

proceeding.  After reweighing the evidence in aggravation against the totality of available mitigating evidence, we conclude that Loving has failed to meet his burden to show a reasonable probability that at least one member would have struck a different balance.  Accordingly, we deny the writ under the second prong of Strickland without "grad[ing] counsel's performance" under the first prong.  Strickland, 466 U.S. at 697.

Our analysis will commence with a summary of the aggravation and mitigation evidence presented at trial.  We will then review the mitigation evidence presented at the DuBay hearing and "reweigh the evidence in aggravation against the totality of available mitigation evidence."  Wiggins, 539 U.S. at 534.

1.  Aggravation Evidence Presented at Trial

We adopt the detailed description of the crimes from our direct review in 1994.  See Loving, 41 M.J. at 229-31.  After robbing two convenience stores at gunpoint, Loving got into a taxicab driven by Christopher Fay, an active-duty soldier working as a cab driver for extra money.

> [Loving] directed Fay to a secluded area on Fort Hood and, at gunpoint, demanded all his money.  After receiving an unknown amount of money from Fay, [Loving] shot him in the back of the head.  While watching the blood "gushing out" of the back of Fay's head, [Loving] shot him in the back of the head a second time.  Fay died as a result of the gunshots.

16

> His body was discovered by another soldier at Fort
> Hood about 30 minutes later.
>
> [Loving] fled from the cab to his barracks room,
> counted the money, and called for a second cab at
> about 8:15 p.m.  The driver of the second cab was
> Bobby Sharbino, a retired Army sergeant.  [Loving]
> directed Sharbino to a secluded street in Killeen and,
> at gunpoint, took his money pouch, wallet, and a green
> BIC cigarette lighter.  He ordered Sharbino to lie
> down on the seat and shot him in the head, killing
> him.

Id. at 229.

Afterwards, Loving went to his girlfriend's home.  A short
time later, he and his girlfriend went to a club with friends.

> [There, Loving] became involved in an altercation with
> another male patron because the patron was staring at
> [his girlfriend].  During the altercation, [Loving]
> drew his pistol and invited the patron to go outside.
> As the patron advanced toward [Loving], [Loving]
> backed up, stumbled over a chair, and dropped his
> pistol on the ground, causing it to discharge.

Id.  Loving and his girlfriend left the club and took a cab,
driven by Howard Douglas Harrison.  Loving's girlfriend was
dropped off near her home.

> After pulling a gun, [Loving] directed Harrison to a
> secluded street, demanded money, and took Harrison's
> wallet and coin changer, obtaining about $94.00.
> [Loving] jerked Harrison's head around and told him to
> open his mouth.  Believing that he was about to be
> killed, Harrison grabbed the pistol.  During the
> ensuing struggle, Harrison gained possession of the
> pistol after it went off.  Then he attempted to shoot
> appellant, but the pistol would not fire.  Harrison
> fled the scene, with [Loving] chasing him.  After
> Harrison hit him, [Loving] ran to [his girlfriend's]
> house, having regained possession of the pistol.

Id. at 229-30.

During the sentencing phase of the trial, the Government presented evidence showing that Loving had previously been subject to nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815 (2006), and that he had received counseling related to poor duty performance on prior occasions.

The Government also presented evidence to show that Loving lacked remorse for his recent crimes. Private Forrest Kevin Brown, who was in pretrial confinement with Loving, testified that Loving told him that "he did the first -- did it the first time to see if he could get away with it, and then he did it because it was fun, and then he said something along the lines, 'Because love makes you do crazy things.'" Brown also testified that he heard Loving say, "if he had to do it over, the only difference is he wouldn't get caught." After Brown testified, the parties presented testimony from prison personnel as to whether Brown would have had occasion to speak alone with Loving. Defense counsel argued that Brown was not credible and that other evidence shows that Loving had shown remorse.

The military judge instructed the members that a death sentence may not be adjudged unless all the court members find beyond a reasonable doubt that one or more of the following aggravated circumstances existed:

> [1] the premeditated murder of Bobby Gene Sharbino
> was committed while the accused was engaged in the
> commission or the attempted commission of a robbery;

[2] having been found guilty of the felony murder of Christopher Fay . . . the accused was the actual perpetrator of the killing;

[3] having been found guilty of premeditated murder of Bobby Gene Sharbino, the accused was also found guilty of another violation of Article 118, [UCMJ], in the same case, and that's referring to the murder of Christopher Fay.

See Rule for Courts-Martial (R.C.M.) 1004(c). The members unanimously found beyond a reasonable doubt that all three of these aggravating factors were proven.

The military judge also instructed the members that seven additional aggravating circumstances may be considered:

[1] the Article 15's received by the accused;

[2] the testimony of Captain Bush that the accused is of average intelligence and has been counseled on occasions in an effort to make him a satisfactory duty performer and, in his opinion, has no rehabilitative potential;

[3] the nature of the weapon used in the commission of the offenses and the fact that the accused fired the weapon during the course of each offense;

[4] the fact that the accused killed his victims after they had fully cooperated with him and had given him their money;

[5] the nature and extent of the injuries suffered by the victims;

[6] the accused's lack of any remorse;[6] [and]
. . . .

[7] the testimony of Private Brown that the accused told Private Brown that the first killing was to see

_____

[6] The military judge instructed the members that whether the evidence established remorse or lack of remorse was for them to decide.

    if he could get away with it and, after that, it was
    for fun.

2.  Mitigation Evidence Presented at Trial

    This is not a case where the record of trial was devoid of

mitigation evidence at sentencing.  The military judge

instructed the members that they must consider the following

nineteen circumstances in extenuation and mitigation:

    [1]  The accused's age;

    [2]  The accused grew up in a low income urban area in
    Rochester, New York;

    [3]  The accused grew up in a single parent household
    with seven other children;

    [4]  Mr. Loving, Sr., the accused's father, and his
    [e]ffect on the accused;

    [5]  The accused was a nonregent student in a troubled
    school system who did not finish high school;

    [6]  The accused was exposed to violence during his
    youth;

    [7]  The accused favorably responded to positive
    leadership at several points in his life;

    [8]  The accused has difficulty expressing and showing
    emotion;

    [9]  Drug involvement in any of these offenses that
    was demonstrated though the evidence, if any;

    [10]  During his early youth, the accused was a
    follower;

    [11]  The accused's boxing experiences;

    [12]  The accused's good duty performance under the
    guidance of strong leadership;

[13]  The accused has exhibited remorse for these offenses . . .;[7]

[14]  The offenses were committed over a relatively short period of time;

[15]  The accused's motives for these offenses;

[16]  The accused's . . . adaptation to confinement; and,

[17]  The accused is precluded from pleading guilty to capital offenses by the [UCMJ] . . .;

[18]  [T]he duration of the accused's pretrial confinement, which began on 13 December 1988;

[19]  The accused's entitlements to wear certain medals and awards . . . .

One of the mitigating factors emphasized by the defense was Loving's motivation at the time he committed the offenses, which defense counsel attributed to his girlfriend's influence over Loving. However, evidence of Loving's family and social background was also prominent in the mitigation case. Defense counsel introduced the idea that Loving's background would be an issue in mitigation during his opening argument in findings, stating as follows:

> From an inter-city [sic] neighborhood, in Rochester, New York; a large, Northeastern city -- a larger, Northeastern city. The youngest of eight children. A father -- an alcoholic, with a rapsheet about four pages long. You'll see this information about the kind of upbringing he had; the kind -- the lack of a strong, parental figure he had -- the need he had for that. The need he had for acceptance . . . .

---

[7] The military judge again instructed the members that they would have to resolve the question of whether the evidence shows remorse or lack of remorse for themselves. See supra n.6.

During closing argument on findings, defense counsel

stated:

> You've learned a little bit about him from his squad
> leader, Sergeant Key.  You know where he's from.  A
> city in the northeast.  You know a little bit about
> his family and his background.  You know what sort of
> person he was.  As -- when he was in the military you
> can pick up on some of the things you've heard
> already.  He was a soldier who wasn't socialized very
> well when he came in.  He wasn't mature and he wasn't
> educated and he didn't have the kind of background
> that would allow him to do well in the military and
> this cost him. . . .  Now that tells you something
> that he didn't have, when he came in the Army; a
> certain lack of background and training and how to
> deal with life.  Go on down the road to that summer
> and fall of 1988 when he met Nadia Pessina.

During the sentencing phase, defense counsel presented the

testimony of a number of witnesses to address Loving's family

and social background.  These included:  Joe Loving Sr.,

Loving's father; Lucille Williams, Loving's mother; Ronald

Loving, Loving's brother; Wendolyn Black, Loving's sister; Lord

Johnson, Loving's childhood boxing coach; and Detective Verna of

the Rochester police department.  Stipulated testimony was

submitted from Harryl Loving, Loving's brother, and Kenneth

Wilson, Loving's childhood teacher.  The arrest records of

Loving's father, the arrest record of a childhood friend, and

Loving's school records were also admitted into evidence.[8]

---

[8] In support of other mitigating factors, defense presented
testimony from two prison guards, a prison counselor, and his
first line supervisor.

The mitigation evidence showed that Loving was the youngest of Lucille Williams's eight children and his early years were spent in a violent neighborhood in a dangerous section of Rochester, New York.  As to Loving's home life, there was evidence that Loving's father was a heavy drinker, who would come in and out of his children's lives.  Loving's father was physically abusive towards Loving's mother, which regularly resulted in police intervention and medical attention.  Ms. Williams told her children not to get involved in the fights unless they saw him killing her.  Loving's oldest sibling, Wendolyn, acknowledged one incident where she had to "try to pull him off" her mother.

Ms. Williams worked nights at Rochester Psychiatric Center and suffered from narcolepsy, a sleeping disorder that eventually required her to quit work.  Wendolyn testified that she cooked and cleaned and babysat to help out around the house.  According to Wendolyn, her mother kept a clean house.  As to discipline, Wendolyn indicated that she and her siblings respected their mother and were disciplined only when they needed it.  Wendolyn stated, "She'd beat us . . . she might whip us with the belt or . . . hit at us with her hand."  Joe Loving Sr., testified that he "spanked [the children] when they did something real bad. . . . to make them cry . . . it would hurt a little bit, but I wouldn't just beat 'em up."

Lord Johnson, who coached Loving and his brothers in boxing and knew the family over many years, testified that Ms. Williams was a single mother on welfare. He agreed that she was "a good woman" and indicated that the children had food and clothes and were "always clean when you see them." He stated that the children had some parental guidance in the home but "needed a little bit more."

The testimony of Loving's mother, his brother Harryl, his brother Ronald, and Lord Johnson shows that of all his siblings, Loving was closest to Ronald, who was five years older than Loving. Harryl testified that when Loving was with Ronald, "they were involved in getting high and playing basketball." According to Loving's mother, Ronald "turned to the streets," got into trouble, and spent some time in jail. Harryl described Ronald as a "street fighter" and "a very active thief [who] had attacked a number of people." When asked what it was like "being a kid in Rochester," Ronald testified that it was "[a] jungle . . . You've got to survive." He elaborated:

> It was just -- you had the Puerto Ricans and you had the blacks and you had the whites and Jamaicans. A lot of prejudice, you know, a lot of gangs. It was just rough. You had to wake up thinking like, you know, you had to fight sometimes to go to the store. We had family fights with people living next door to us . . . .

He said: "[Y]ou either fight or you move -- move meaning out of Rochester." When asked why such a choice existed, Ronald

stated:  "Well, it's scary.  They take you -- they take you out -- they'll kill you.  If they don't kill you, they'll wound you real bad."  Ronald said that he "fought every day."  He had been "stabbed," "busted up side the head," "jumped," "hit by a car," "shot at," "cut," and "tricked."

Several other witnesses addressed problems of drugs and gang violence that the Loving children were exposed to as they grew up in Rochester.  Detective Verna stated that there are four "very, very rough neighborhoods" in Rochester and that a great number of assaults occur in the Rochester schools, which many people consider "armed camps."  He testified that the drug problem in Rochester is "pervasive."  According to Loving's mother, "they're fighting, they're drinking, they're stealing, they're doing everything."  Harryl testified that "[t]here are neighborhoods where the violence is high, where the street gangs roam and where you can get into trouble, even if you're not looking for it."  Harryl testified that his sister's house was burned down by gang members and that his brother Darryl was jumped by gang members.  Lord Johnson also discussed gangs in the Rochester neighborhoods, reiterating that Loving's brother was beaten up by a gang, and indicating that a close friend of Loving's from the boxing program who joined a gang was incarcerated for "tr[ying] to kill someone."

Other testimony from these family and background witnesses established that Loving lived in two different neighborhoods when he was growing up. The second was much cleaner and safer than the first. According to Harryl, "Oakbend was the worst. The house on Stunz was better. It was cleaner and had better neighbors. There were not as many fights, drug sellers, or criminal acts as there were on Oakbend Street." Harryl, who was two years older than Loving, testified that the family moved to the better neighborhood when Harryl was in about eighth grade in 1979. Harryl claimed that the second neighborhood was "relatively drug free when we were growing." Harryl stated that he "stayed in the new neighborhood, but his brothers Ronald and Joe Junior used to go back to their friends in the old neighborhood."

The stipulated testimony of Kenneth Wilson, Loving's school teacher, described Loving as moody and temperamental -- "feverish" -- which he said was typical of students who had a history of poor performance in academics and lived in the inner city. He testified that Loving appeared distracted and had to be closely monitored. He was transferred to a special school for students having problems with their regular high school. Ms. Williams stated that Loving never graduated. Loving's father was not aware that he had transferred schools and believed that he "graduated every year." School records showed

that Loving was frequently absent from school and that he was suspended for fighting at school and for possession of a knife on school premises. According to Mr. Wilson, Loving's parents never came to high school to ask about progress or problems.

For about thirteen years prior to trial, Ms. Williams's current husband, Mr. Williams, lived in her home. Ms. Williams testified that Mr. Williams "always done well by all of [the children], but they . . . resent him saying what he wanted to say." Ronald Loving testified that he hated Mr. Williams. He described him as the "worstest [sic] man I've ever met in my life, and I've met some bad people."

The mitigation evidence related to Loving's background predominantly focused on the difficulties Loving and his siblings faced in childhood. Some testimony from Lord Johnson, however, was positive. Mr. Johnson talked favorably about the facility where he ran the boxing program, the sense of direction that the boxing program offers the children, and Loving's success at boxing. He spoke about the "beautiful relationship" that he had with Loving while Loving was training and competing in the boxing program. During closing on sentencing, defense counsel argued that this evidence showed that Loving could respond to positive leadership in his life and that he did "attempt to rise above his situation there and he did achieve

some measure of success. But it may be a case of too little, too late in his development."

Defense counsel spent a fair portion of his closing argument calling the members' attention to Loving's troubled background. He urged the members to consider the "surroundings under which he grew up, especially from the ages of zero to ten, when he was on Oak Lawn -- or, Oakland,[9] in that area, that's been torn down, that's being redone because what was there was not acceptable." He urged the members to "[c]onsider what [e]ffect that had in shaping his development as he was growing up, forming his values, deciding how he makes judgements." Defense counsel argued that Loving grew up in "environment filled with violence," in an "urban, northeastern city, sometimes on the streets" in a broken home with "no real father to speak of." Defense counsel reminded the members of Loving's brothers' testimony as to the violence they saw in their youth and the family's interaction with gangs.

Defense counsel also mentioned Loving's mother's illness and how as the youngest of eight children Loving received less of the guidance, love and care that was necessary. He argued that Loving's siblings were not good role models, pointing to his brother Darryl, who had been attacked by a gang, and his

brother Ronald, "the survivalist."  Defense counsel also

discussed how the school environment failed to provide Loving

with "the socialization skills for getting along with people

later in life" and argued that Loving's parents were not there

to guide him through school when the system failed him.

Defense counsel urged the members to decide against the

death penalty because of Loving's "values, his judgement, and

his maturity or, more accurately, his immaturity."  Defense

counsel argued:

> You know where he learned these things, he learned his
> values, you know he learned them from.  He didn't have
> a strong brother, he didn't have a strong father, a
> mother with the time to provide him what he needed.
> His teachers didn't help. . . .  His background makes
> him less able to handle situations like he did back on
> the 11 and 12 December.  Like they say, you can take
> the man off the streets, but can't necessarily take
> the street . . . out of the man.

Acknowledging that Loving grew up in the inner city where

there are gangs, drugs, and violence, that Loving's brother

participated in some of that violence, and that Loving's father

beat his mother, trial counsel responded that there was little

testimony as to what the real effect of this was on Loving

himself.  He pointed out that Ms. Williams was a good woman who

did everything she could, that his parents did not teach Loving

that it was alright to commit crimes, that while his mother took

---

[9] Defense counsel was referring to one of the first streets the
Loving family lived on in Rochester, which was identified as

a belt to the children when the kids deserved it, they were not abused children.  He noted that Loving himself was not a street fighter like his brother Ronald and that Loving had opportunities through a special school and through the boxing program, both of which he gave up on.

Of the nineteen mitigating circumstances that the military judge instructed the members they must consider, at least six related to the hardships from Loving's background and environment, including:  the "accused grew up in a low income urban area in Rochester, New York;" the "accused grew up in a single parent household with seven other children;" "Mr. Loving, Sr., the accused's father, and his [e]ffect on the accused;" the "accused was a nonregent student in a troubled school system who did not finish high school;" the "accused was exposed to violence during his youth;" and "[d]uring his early youth, the accused was a follower."

3. Mitigating Evidence at the DuBay Hearing

In this case, the crux of our prejudice inquiry under Strickland is whether there is a reasonable probability that the mitigating evidence introduced at the DuBay hearing would have produced a different result had it been introduced at trial. See Wiggins, 539 U.S. at 537-38; see also Rompilla v. Beard, 545 U.S. 374, 393 (2005).  At the DuBay hearing, four witnesses

_____

either "Oakbend" or "Oakman" during the trial and the DuBay

provided testimony about Loving's background:  his sisters Wendolyn and Gwendolyn Black, his brother Harryl Loving, and his aunt, Alline Anderson.  Wendolyn Black and Harryl Loving had testified at trial; the other two had not.  The defense also presented the testimony of Ms. Janet Vogelsang, a social worker, along with Ms. Vogelsang's written biopsychosocial assessment of Loving.  The defense also submitted records from the New York State Department of Social Services documenting some of the services, assistance, and home visits provided to the family from 1967 to 1985, as well as some medical records related to Loving's birth and pediatric care.[10]

---

hearing.

[10] We have also reviewed the testimony of the other witnesses who testified at the DuBay hearing, including the three trial defense counsel, a forensic psychiatrist who consulted with trial defense counsel, various capital litigation experts, an expert in psychopharmacology, acquaintances of Loving who were with him on the night of the murders, and a fellow servicemember.  The testimony of these witnesses pertains to allegations of counsel's deficient performance under the first prong of Strickland or to counsel's alleged failure to present evidence in mitigation related to Loving's intoxication and mental state at the time of the offenses.  As our analysis of the prejudice prong of Strickland focuses on the mitigation evidence related to Loving's family and social background, we do not recount this other testimony in detail here.  See supra pp. 12-13 and n.5.  Similarly, we reviewed but do not recount in detail other documentary evidence presented at the DuBay hearing including but not limited to submissions regarding the standards of practice for capital defense attorneys, trial defense counsel's notes, Loving's possible drug use around the time of the murders, and medical records of Loving's brothers, which were generated in February 1989, November and December 1991, and August and September 1992.

The testimony of all four family members addressed Loving's father's drinking problem and his physical abuse toward their mother. A few specific incidents were described, including one where Wendolyn hit Joe Loving Sr., with a hammer to protect her mother and another where Joe Loving Sr., beat Lucille Williams "so bad he stripped her, just tore everything off, and left her in the street." The testimony also gave specifics as to violence between the Loving family and their neighbors on Oakbend Street. Wendolyn testified that her family would get into fist-fights with the neighbors and her uncle once brought out a gun. Gwendolyn testified that she was hit in the head

---

In addition, affidavits from Gwendolyn and Wendolyn Black, Ronald and Harryl Loving, and Lucille Williams, which were signed in 1993, were submitted as part of the habeas proceedings. These affidavits had previously been filed with this court and we instructed the DuBay judge to evaluate the credibility and reliability of the factual information contained in the affidavits. Loving, 64 M.J. at 152. Noting that the affidavits of Harryl Loving, Wendolyn Black, and Gwendolyn Black "were drafted by an unknown third party and presented to each individual for signature, not read (or not read thoroughly) by the individual prior to signing, and contained inaccurate or false information," the DuBay judge found the information in these three affidavits was not reliable. As to the affidavits of Lucille Williams and Ronald Loving, who did not testify at the DuBay hearing, the DuBay judge indicated that he was not able to judge their credibility and found that the information contained in those two affidavits was credible to the extent that it was consistent with their testimony at trial or otherwise corroborated by the testimony of the DuBay witnesses. We review the DuBay judge's credibility determinations for clear error and find none. See United States v. Brownfield, 52 M.J. 40, 44 (C.A.A.F. 1999). As such, while we have reviewed the affidavits, we find it appropriate to focus our discussion on the background information provided through live testimony and other documentary evidence.

with a bat and her brother Joe was hit with a bed rail.  She recalled hearing about an incident when "molly [sic] cocktails" were thrown through the windows of the family home.  Ms. Anderson described a night when bullets started coming through the windows and they all had to duck to the floor.

Gang violence was also addressed in the DuBay testimony.  Wendolyn believed that Loving was staying with his sister at the time her house was burned down by a gang and Gwendolyn believed the act was in retaliation for Loving's "beating them up."  Wendolyn recalled that Loving was having problems with gangs, who "jumped on his friend."  She also testified that a gang "jumped on [her brother Darryl] and beat him senseless."

Loving's siblings addressed questions as to whether the children suffered any physical harm from the disciplinary actions of their parents or siblings while growing up.  Harryl and Gwendolyn indicated that Joe Loving Sr., would use a leather belt to whip the boys' bare skin.  When asked what prompted such punishment, Harryl stated that "it's hard to remember a lot of the bad things that we did as kids."  Harryl remembered one incident when his mother spanked the children with a stitching cord after they skipped school and went to a shopping center where they started stealing.  Gwendolyn testified her mother would discipline them with a belt, switch or extension cord.

Wendolyn testified that while her mother was working nights, she and her sister Gwendolyn would take care of the younger children. There were instances when Wendolyn would hit the other children, "knock 'em up-side the head or something" with her hand. Gwendolyn testified that she and Wendolyn would teach the boys to fight each other and if they did not want to fight, they would hit them to get them to fight. Harryl denied any recollection of Wendolyn abusing him. At one point, Harryl described his sibling relationship as follows: "when we were real young, we all hung together. We played together. We played kickball. We played football. We played basketball. We played baseball. We played volleyball. We played dodge ball. . . . [W]hen we were on Oakman Street, we all played together."

Each of the three siblings testified as to the drinking and drug habits of the children growing up. There was consensus that all the children drank. Drug use also seemed prevalent among the children, although some appeared more involved with drugs than others. Although Gwendolyn denied it, there was testimony from the other siblings that she sold drugs and Ronald and Joe Jr., worked for her while they were teenagers. Harryl testified that Ronald supplied Loving with alcohol and marijuana. Gwendolyn testified that she saw Loving smoke marijuana and drink Wild Irish Rose when he was fourteen years old.

The family witnesses offered other details about the Loving family's background. Ms. Anderson discussed tragedies that occurred in Ms. Williams's life before she lived with Joe Loving Sr. There was also testimony as to Ms. Williams's belief in "roots," which was described as "voodoo" that caused bad things to happen to people. Ms. Anderson testified that Ms. Williams kept "clean homes" but there were big rats in the house. There was testimony that the family "struggled badly" and there "were times we ate beans with no bread, no meat. There were times we ate bread, no meat, no vegetable, or anything -- no lettuce, no nothing; just mayonnaise and tomato sandwiches, banana sandwiches. So we struggled -- wearing brother's and sister's hand-me-downs."

As to additional details revealed during the DuBay hearing, Wendolyn testified that Joe Loving Sr., sexually abused her when she was twelve years old. Gwendolyn moved out when she got pregnant at the age of thirteen. Mr. Williams, who eventually married Loving's mother, was described as an alcoholic, who constantly drank and cursed. He used to say things to the children like "'[t]he more education you have the stupider you are,' 'You're never going to amount to anything,' 'You don't have anything, you're not going to get anything.'"

The records from the Department of Social Services document some of Ms. Williams's struggles in supporting her family as a

single mother.  The records show that they moved frequently due to poor housing conditions before moving to Oakbend Street. Various entries describe Ms. Williams in such terms as "hard worker," "a strict disciplinarian [and] at times rather harsh," "full control at home -- good disciplinarian," "fiery temper." Loving's brief cites to the social worker's documentation of an instance when Ms. Williams was hospitalized and it was reported that one of the boys was not dressed adequately, that the house was very messy, that the children were not being sufficiently cared for, and that Ms. Williams objected to the assignment of a homemaker.  By contrast, a follow-up entry after Ms. Williams returned home from the hospital reflects that Ms. Williams is a "wonderful mother and has no problem managing 8 children.  The children are very well behaved and all follow their mother's guidance.  They each have assigned tasks to do at home and the household is run very smoothly."

As part of the habeas proceedings, Ms. Vogelsang, a clinical social worker, performed a biopsychosocial assessment of Loving.  During the DuBay hearing, Ms. Vogelsang testified that the most significant dynamic in Loving's family, which has spanned over generations, is a pattern of over reactive behavior to violent behavior in the face of loss, abandonment, or rejection.  Ms. Vogelsang testified that these behaviors occurred "within a context of family violence, community

36

violence, abuse, alcohol and drug use, neglect, and a lack of intervention on a long term or consistent basis especially during the developmental years." Ms. Vogelsang identified a number of factors that when present in a child's home lead to children who are unable to bounce back from adversity, and she opined that most of these factors were present in Loving's home.[11]

Ms. Vogelsang discussed her views as to the significance of certain difficulties in Loving's childhood and addressed such issues as the traumatic social background of his parents, the nature of the violence between his parents, the troubling role his siblings played in his upbringing, his frequent moves among insufficient housing before the age of five, the incidents of violence brought against his home, and a pattern of drugs and alcohol in his family. Ms. Vogelsang also explained that when a child lives in a community where there is a constant fear of gang violence that at times has been realized against the child himself or a family member, "a child either has to isolate

---

[11] These factors include lack of guidance and mental health intervention, divorce and separation, multiple moves, abuse, abandonment, homelessness, a disabled family member, immigrant status, lack of role models, growing up witnessing violence, the lack of consistent care giving, an inability to trust, worry about violence in the home which affects learning in school, impaired cognitive functioning, inability to deal with aggressive feelings, repression of feelings, sense of helplessness, and poor problem solving skills. According to Ms. Vogelsang, all applied to Loving except immigrant status and possibly impaired cognitive learning.

themselves and engage in all the behaviors that go along with that isolation, or they have to go out there and learn to survive on those streets along with the other kids."  She presented a model designed to explain the impact of "psychological battering" on children and provided examples from Loving's life that exemplified the model.  As to harsh physical discipline, Ms. Vogelsang explained that "[m]any in the mental health field believe that this has an impact on self worth, on self-esteem, that you're not valued as a human being."

Ms. Vogelsang stated:

There is an accumulation of factors over time that do build, and if there is not anything to compensate for that, if there are not any positive factors, if there's not a degree of resilience, then those people tend to be at high risk as adults.  They tend to have poor judgment and insight; they tend to make poor decisions.  They start doing all of that as children and then it leads them into adulthood where they are doing the same things only now they're bigger and, you know, less safe.

Ultimately, in her written assessment, Ms. Vogelsang concluded:

There was an accumulation of factors that over time resulted in the missocialization of Dwight Loving.  Whatever potential he had, and he did have potential that was occasionally brought to light for brief periods, was not developed consistently enough to create the resilience he needed to resist the influence of his home and community during his developing years.  Dwight succumbed to the patterns in his family and this is best illustrated by his inability to handle rejection and the self-medication of his pain with substances, both of which were prominent in the weeks and days prior to and during the crimes for which he stands convicted.

38

4. Discussion

The Supreme Court has repeatedly recognized that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990) (citation, quotations marks, and emphasis omitted); see also Wiggins, 539 U.S. at 535 ("Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability."). Without question, this case involves a defendant with a disadvantaged background. However, in contrast to cases like Rompilla, 545 U.S. at 378, Wiggins, 539 U.S. at 515, and Williams v. Taylor, 529 U.S. 362, 369 (2000), which addressed defense counsel's complete failure to inform the sentencing panel about the defendant's difficult past, trial defense counsel in this case presented a mitigation case to the members that devoted a significant degree of attention to Loving's troubled childhood.

In making his case for prejudice, Loving characterizes the difference between the mitigation case presented at sentencing and the mitigation case presented at the DuBay hearing as "remarkable." Loving argues that at the trial his defense

39

counsel presented only a "superficial glance at the horrific reality of Dwight Loving's life" and did not provide "a true picture of the horrors of his life."  He contends that the mitigation evidence presented at trial was "just general background information concerning the Loving family without any real focus on Dwight Loving" and that trial counsel highlighted this shortcoming during his argument to the members.  Quoting Wiggins, 539 U.S. at 537, Loving argues that "[i]f the panel had heard the full extent of this 'excruciating life history' and its impact on his development and mental state 'there is a reasonable probability that at least one juror would have struck a different balance.'"

In a comparable context, the United States Court of Appeals for the Sixth Circuit articulated a framework that we find useful:  "[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way -- in strength and subject matter -- from the evidence actually presented at sentencing."  Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir. 2005); cf. Williams v. Allen, 542 F.3d 1326, 1342 (11th Cir. 2008) (finding prejudice when the new mitigation evidence "paints a vastly different picture of [the defendant's] background" than testimony presented at trial); Buckner v. Polk, 453 F.3d 195, 207 (4th Cir. 2006) (concluding that there is no prejudice under Strickland when new evidence merely "rounds out

40

the details of a personal history already presented to the jury"). In this case, the mitigation case presented at the DuBay hearing provided some new information and arguably did more than "round[] out the details" of Loving's personal history by offering additional grim and graphic information about Loving's disadvantaged upbringing. Buckner, 453 F.3d at 207. However, it did not ultimately change the sentencing profile presented by defense counsel at trial. We do not believe that the new evidence sufficiently differed in strength and subject matter from the information considered by the members at trial to establish prejudice in this case.

As made clear by our description of the sentencing evidence above, the evidence presented at the trial showed that Loving was the youngest of eight children raised by a single mother on welfare in a dangerous section of the inner city. The members were informed that Loving's mother had to stop working because of her narcolepsy, that she struggled financially, and that she suffered severe physical abuse at the hands of Loving's alcoholic father in the presence of the children. The evidence showed that Loving's childhood environment and family life were marked by alcoholism, drugs, family violence, neighborhood violence, school violence, and gang violence.

The evidence adduced during the DuBay hearing emphasized Loving's father's drinking problem and provided specific

41

examples of violence in Loving's home and neighborhood. There is no doubt that the DuBay evidence added some detail about the violence the family witnessed and participated in, the financial struggles they endured, and the children's exposure to drugs and alcohol, but it was largely cumulative of the type of information presented to the members at trial. The evidence adduced during the DuBay also emphasized that Ms. Williams was a harsh disciplinarian and punished the children by using a belt, switch, or extension cord. Again, this is largely cumulative of evidence presented at sentencing where Wendolyn Black testified that their mother "would beat" the children, "whip [them] with the belt," or "hit [them] with her hand."[12]

We note that some new information came out of the DuBay proceedings. The DuBay hearing revealed instances where the children mistreated each other and Loving points to one instance of neglect documented in the social service records when their mother was hospitalized and the children were without adequate adult supervision. While we do not diminish the troubling nature of these circumstances, we do not believe the evidence

---

[12] The DuBay evidence established that Loving's father also disciplined the children by hitting them with a belt, which differed from the trial presentation where he testified only that he spanked the children so that it would "hurt a little bit." However, the basic fact that the children endured harsh corporal punishment was consistent between the presentations, and the DuBay evidence does not raise allegations about physical abuse by Loving's parents any more so than the sentencing evidence presented at trial.

differs in kind or degree from circumstances as they were presented to the members. This is particularly so considering that the DuBay hearing offered some contrasting evidence on these particular points. Harryl Loving's testimony during the DuBay described how the children played together when they were young and denied that his sister abused them. After following up on Ms. Williams's return from the hospital the same social service records documenting the neglect characterize Loving's mother as a "wonderful mother."

We recognize, moreover, that the DuBay hearing also touched on the history of violence and abuse in Lucille Williams's upbringing, her belief in voodoo, Gwendolyn's teenage pregnancy and Wendolyn's sexual abuse, none of which were raised at the initial trial. Further, the DuBay hearing included testimony from a social worker explaining how Loving's traumatic childhood negatively impacted his development.

As to the new evidence, including the expert's testimony about the impact that Loving's tragic childhood had on his development, we simply do not find the additional information to be sufficiently compelling as to establish prejudice in this case, where the aggravating factors are overwhelming and where the members were presented with substantial information regarding Loving's disadvantaged youth. Loving killed two cab drivers in separate instances by shooting them in the back of

43

the head after each one complied with his demand for money.  He tried to kill again but the third cab driver struggled the gun away from Loving as he was about to shoot him.  The members found three required aggravating factors beyond a reasonable doubt and imposed the death penalty despite being instructed on nineteen mitigating factors by the military judge, including substantial evidence as to Loving's disadvantaged background.

Certainly the mitigation evidence presented at the DuBay hearing reinforced and emphasized Loving's traumatic childhood. It also provided some new details about the hardships he and his family endured as he was growing up and included expert testimony that he lacked the resilience to resist the influence of his home and community during his developing years and eventually succumbed to the patterns of his family life. However, the members were aware that Loving's childhood environment and family life were scarred by alcoholism, drugs, family violence, neighborhood violence, school violence, and gang violence.  And while we do not diminish the potential value of expert testimony in capital sentencing proceedings that addresses how a traumatic childhood could negatively impact a defendant's development, the members in this case were at least exposed to this theory through defense counsel's argument, which urged them to consider that Loving's background made him less able to handle situations like those he confronted on the night

of his crimes.[13]  We conclude that the new details as to these circumstances do not alter the sentencing profile in a material manner.

Reweighing the aggravating evidence against the totality of mitigating evidence, we are convinced beyond a reasonable doubt that if the members had been able to place the additional evidence adduced during the habeas proceedings on the mitigating side of the scale, a reasonable probability that at least one member would have struck a different balance does not exist.  We conclude that Loving has failed to meet his burden to establish prejudice under Strickland and deny the petition for extraordinary relief in the nature of a writ of habeas corpus.

### DECISION

Loving's petition for extraordinary relief in the nature of a writ of habeas corpus is denied.

---

[13] Defense counsel had been consulting with a forensic psychiatrist who was competent to assess the impact of Loving's traumatic social background on his development and to advise defense counsel in this regard.  This expert was able to inform defense counsel's understanding of the social history nexus and to influence how defense counsel presented this information to the members.

Loving v. United States, No. 06-8006/AR

    EFFRON, Chief Judge (concurring):

I concur in the majority opinion.  I write separately solely to note adherence to my previously expressed views in Loving v. Hart, 47 M.J. 438, 454-60 (C.A.A.F. 1998) (Effron, J., concurring in part and dissenting in part), regarding the distinct issues raised in that writ-appeal concerning the voting procedures during sentencing at petitioner's court-martial.

STUCKY, Judge (concurring in part and in the result):

I have concerns similar to those raised by Judge Ryan regarding the appropriateness of applying to the review of this Court's own previous decisions the same habeas standards, under 28 U.S.C. § 2254 (2006), as federal courts apply in habeas reviews of state court decisions.  Judge Ryan also makes an interesting point about our habeas corpus jurisdiction in cases in which direct appellate review has been completed.  I write separately today, however, solely because I am convinced that the defense team's performance was not deficient.  I concur with the majority's conclusion that, in any event, Loving failed to show that he was prejudiced by his counsel's performance.

## I.  Effective Assistance of Counsel

### A.  The Law

"A military accused is entitled under the Constitution and Article 27(b), Uniform Code of Military Justice, (UCMJ), 10 U.S.C. § 827(b) (2000), to the effective assistance of counsel." Denedo v. United States, 66 M.J. 114, 127 (C.A.A.F. 2008).  In reviewing claims of ineffective assistance of counsel, this Court employs the two-part standard of Strickland v. Washington, 466 U.S. 668, 692-93 (1984).  United States v. Gutierrez, 66 M.J. 329, 330-31 (C.A.A.F. 2008).

> First, the defendant must show that counsel's
> performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  These same standards apply to capital sentencing proceedings.  Id. at 686 (Strickland itself was a capital sentencing case).

"This Court reviews factual findings under a clearly erroneous standard, but looks at the questions of deficient performance and prejudice de novo."  United States v. Gutierrez, 66 M.J. 329, 330-31 (citing United States v. Paxton, 64 M.J. 484, 488 (C.A.A.F. 2007)); United States v. Davis, 60 M.J. 469, 473 (C.A.A.F. 2005).

The first part of the test requires an appellant to "show that counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms."  Strickland, 466 U.S. at 688 (citations omitted).  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Id. at 690.

Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

2

> counsel's perspective at the time.  Because of the
> difficulties inherent in making the evaluation, a
> court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable
> professional assistance; that is, the defendant must
> overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); United States v. Perez, 64 M.J.

239, 243 (C.A.A.F. 2006).  "[T]he court should recognize that

counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of

reasonable professional judgment."  Strickland, 466 U.S. at 690.

> As the Court of Appeals concluded, strategic choices
> made after thorough investigation of law and facts
> relevant to plausible options are virtually
> unchallengeable; and strategic choices made after less
> than complete investigation are reasonable precisely
> to the extent that reasonable professional judgments
> support the limitations on investigation.  In other
> words, counsel has a duty to make reasonable
> investigations or to make a reasonable decision that
> makes particular investigations unnecessary.  In any
> ineffectiveness case, a particular decision not to
> investigate must be directly assessed for
> reasonableness in all the circumstances, applying a
> heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91.

### B.  Discussion

Appellant focuses his complaint of deficient performance on

two aspects of the trial defense team's conduct:  (1) the

failure to hire a mitigation specialist; and (2) the claim that

a mitigation theory was initially formulated, and the subsequent

investigation was restricted to its narrow confines.  I find neither argument persuasive.

(1)  Failure to hire a mitigation specialist

Citing the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines), Appellant asserts that the "prevailing professional norms" at the time required the defense team to secure the assistance of experts who could assist in the investigation and presentation of mitigating evidence.  ABA Guideline 11.4.1.D.7(D) provides that "[c]ounsel should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation."  There is no requirement, even today, that a mitigation specialist be hired in every death penalty case.

Despite a gradually emerging practice of hiring a social worker or other mitigation specialist, the prevailing norm at the time of Appellant's trial was for the defense team to conduct a reasonable, independent investigation into the accused's family and background in an effort to discover mitigating evidence.

> While use of an analysis prepared by an independent
> mitigation expert is often useful, we decline to hold
> that such an expert is required.  What is required is
> a reasonable investigation and competent presentation
> of mitigation evidence.

4

United States v. Loving, 41 M.J. 213, 250 (C.M.A. 1994).  As the DuBay hearing[1] judge concluded, there was certainly no consensus as to the need for mitigation specialists in 1989.

Appellant was sentenced to death on April 3, 1989, and the ABA did not adopt the Guidelines until its February 1989 Midyear Meeting, while the defense team was litigating Appellant's case. The ABA specifically noted in the introduction to the Guidelines that (1) "[w]hile some local standards may exist for capital representation, national guidelines on the assignment and performance of counsel in capital cases did not exist prior to these Guidelines," and (2) the ABA House of Delegates' resolution approving the Guidelines specifically provided "for such exceptions to the Guidelines as may be appropriate in the military."  Although we have found the Guidelines "instructive," this Court has "expressly declined to mandate that military defense counsel meet" those guidelines.  United States v. Murphy, 50 M.J. 4, 9 (C.A.A.F. 1998) (concerning the appointment of death penalty qualified attorneys) (citing Loving, 41 M.J. at 300).

Appellant further argues that, contrary to the Supreme Court's holdings in Wiggins v. Smith, 539 U.S. 510 (2003), Williams v. Taylor, 529 U.S. 362 (2000), and Strickland, the defense team formulated its theory of the sentencing case before

---

[1] United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967).

they fully investigated, restricted the rest of the investigation to facts supporting that theory, and thus failed to discover important mitigating evidence.  In Wiggins and Strickland, the trial defense counsel attempted "to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead."  Wiggins, 539 U.S. at 521 (referring to Strickland, 466 U.S. at 673).  In Williams, the Supreme Court found the "ineffectiveness claim meritorious" because "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background.'"  Id. at 522 (quoting Williams, 529 U.S. at 396).

 Appellant's defense team did form a tentative sentencing theory shortly after being assigned to the case, and Appellant is correct in asserting that now, years after he was sentenced to death, his family has come forward with some mitigating evidence.  But the defense team at the time acquired all of the relevant school, medical, mental health, and military records. They interviewed Appellant extensively, visited his hometown, spoke to family, friends, teachers, law enforcement officials, and the community center boxing coach.  They learned much about

Appellant, his background, his family, and the community from which he entered military service, and were fully able to present that evidence to the court-martial. They also obtained the services of a forensic psychiatrist who had a law degree. The forensic psychiatrist reviewed all the records, including the sanity board and statements, spoke with the witnesses and at least one member of the sanity board, and examined Appellant.

Ultimately, the defense team decided not to have the forensic psychiatrist testify because they feared it would cause the military judge to release the full contents of the sanity board to the prosecution, revealing that Appellant had "sociopathic tendencies." This is precisely the kind of tactical decision that, under Strickland, we will not second-guess. 466 U.S. at 689; United States v. Perez, 64 M.J. at 243; United States v. Anderson, 55 M.J. 198, 202 (C.A.A.F. 2001).

In Wiggins and Williams (529 U.S. at 396), the defense teams abandoned their investigations prematurely because of the constraints of their tentative theories of their cases. Appellant's defense team, on the other hand, did everything that the counsel in those cases failed to do. The scope of their investigation was reasonable under the prevailing professional norms "as seen 'from counsel's perspective at the time.'" Wiggins, 539 U.S. at 523 (quoting Strickland, 466 U.S. at 689). Their performance did not fall "below an objective standard of

7

reasonableness." Strickland, 466 U.S. at 688. They were, therefore, not ineffective.

RYAN, J., (dissenting):

## I.  Introduction

Direct judicial review of this case was completed in 1996 upon affirmation of Petitioner Loving's conviction by both this Court and the Supreme Court.  United States v. Loving (Loving I), 41 M.J. 213 (C.A.A.F. 1994); Loving v. United States (Loving II), 517 U.S. 748 (1996).  In 2005, this Court considered and rejected Loving's petition for a writ of error coram nobis, but suggested that it could and would entertain a petition for a writ of habeas corpus.  Loving v. United States (Loving III), 62 M.J. 235, 256 (C.A.A.F. 2005).  In 2006, the Court entertained the present petition and ordered an evidentiary hearing.[1]  Loving

---

[1] The Court ordered that Loving's case be returned directly to this Court following the evidentiary hearing, rather than first allowing the appropriate convening authority and court of criminal appeals (CCA) to review the military judge's factual findings.  Loving IV, 64 M.J. at 152-53.  The Court did so without considering how such makeshift collateral review of final cases would impact procedural mechanisms we have already made up.  By commanding that the case be returned directly to this Court, the Court disturbed the multi-step review of the records of courts-martial provided by the Uniform Code of Military Justice (UCMJ), see generally Articles 60, 66, 67, UCMJ, 10 U.S.C. §§ 860, 866, 867 (2006) (establishing the various steps for review of courts-martial), that our practice of remanding for "DuBay hearings" seeks to emulate.  See generally United States v. DuBay, 17 C.M.A. 147, 149, 37 C.M.R. 411, 413 (C.M.A. 1967) (setting forth the procedure for developing new factual matters after trial, to include a convening authority referring the case to a court-martial for an evidentiary hearing to enter findings of fact and conclusions of law on the record for further review by the convening authority and, if necessary, by the appropriate CCA and CAAF).  This judicially crafted DuBay procedure at least creates the legal

v. United States (Loving IV), 64 M.J. 132, 132 (C.A.A.F. 2006).

The majority now rules on the merits of this petition, and determines that it should be denied. Loving v. United States (Loving V), __ M.J. __ (2-3) (C.A.A.F. 2009). To reach this conclusion, the majority entertains a habeas corpus petition for a case in which direct review is complete. This Court lacks jurisdiction to hear such a petition. Rather, jurisdiction falls squarely within the authority of Article III courts, both by statute and historic practice. I would dismiss the petition for lack of jurisdiction and, therefore, respectfully dissent.

## II. The Jurisdiction Fiction: Loving III

The assumption of jurisdiction made by this Court in 2005 and echoed today was not based on any statute authorizing us to conduct habeas review of a case in which direct review has been completed. And it was made despite clear statutory jurisdiction over such cases by Article III courts. The labyrinthine reasoning that underlies the 2005 conclusion that this Court had jurisdiction is unsustainable. See infra 12-17.

To the extent review of a case in which direct review is

---

fiction that we are only reviewing facts in "the record," by having the new facts reviewed by the convening authority and CCA. See Denedo v. United States, 66 M.J. 114, 136 (C.A.A.F. 2008) (Ryan, J., dissenting) (noting the "unwieldy and imperfect system" created by DuBay to enable additional factfinding). In this case the facts considered are not properly in "the record" -- we do not have, because we bypassed it, the benefit of review of the military judge's factual findings by either the convening authority or the Army Court of Criminal Appeals.

complete may be undertaken by this Court at all, the Supreme Court's recent decision in United States v. Denedo clarifies that such jurisdiction rests on the nature of the writ in question; it must constitute "direct review" of the original case under Article 67, UCMJ, and not rely on a general notion of continuing jurisdiction over cases where we once had jurisdiction. 129 S. Ct. 2213 (2009). Compare id. at 2221 (distinguishing jurisdiction over a coram nobis petition -- "a belated extension of the original proceeding," dependent entirely upon whether there was jurisdiction over the original proceeding under Articles 66 and 67, UCMJ -- and a habeas corpus petition, "'a separate civil proceeding'" (quoting United States v. Morgan, 346 U.S. 502, 505 n.4 (1954)); with Loving III, 62 M.J. at 250 ("Congress gave this Court the authority to conduct a mandatory review of death penalty cases. Under this authority, this Court remains the primary judicial body with jurisdiction over Petitioner's case, and this Court has authority to reexamine its prior decision in this case."). Even if the relevant statutes and historic practice did not clearly establish that Article III courts, and not this Court, have jurisdiction over this habeas petition, Denedo compels that conclusion. See infra pp. 12-13.

### A. This Court Has No Jurisdiction Over This Habeas Petition Under Article 67, UCMJ

This Court's jurisdiction is strictly defined by Congress in Article 67, UCMJ.  See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 818 (1988) ("'Courts created by statute can have no jurisdiction but such as the statute confers.'" (quoting Sheldon v. Sill, 49 U.S. (8 How.) 441, 449 (1850))).  Although created to oversee the military justice system, this Court is limited in both the types of cases it may review and the extent to which it may review them.  See Article 67(c), UCMJ ("[T]he Court of Appeals for the Armed Forces may act only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the Court of Criminal Appeals."); Denedo, 129 S. Ct. at 2223 (emphasizing that C.A.A.F.'s jurisdiction is limited by Article 67, UCMJ); Clinton v. Goldsmith, 526 U.S. 529, 535-37 (1999) (C.A.A.F.'s "jurisdiction is narrowly circumscribed. . . . [It] is accorded jurisdiction by statute (so far as it concerns us here) to 'review the record in [specified] cases reviewed by' the [CCAs] . . . .  [T]he CAAF spoke too expansively when it held itself to be 'empowered by the All Writs Act to grant extraordinary relief in a case in which the court-martial rendered a sentence that constituted an adequate basis for direct review . . . .'" (citations omitted)).

Following direct review by this Court, an accused may petition the Supreme Court for review. Article 67a, UCMJ, 10 U.S.C. § 867a (2006). After the Supreme Court has acted on that petition, the "judgment as to the legality of the proceedings is final," ending direct judicial review. Article 71(c), UCMJ, 10 U.S.C. § 871 (2006); accord Rule for Courts-Martial (R.C.M.) 1209(a). The Supreme Court's affirmation of Loving's conviction in 1996 marked the end of direct judicial review in this case. See Article 71(c), UCMJ; Loving IV, 64 M.J. at 137.

After direct judicial review is complete in a capital case, the military justice system provides three possible extra-judicial remedies that stand between an accused and the carrying-out of his sentence: a successful petition to the Judge Advocate General for a new trial under Article 73, UCMJ, 10 U.S.C. § 873 (2006); action taken by a service secretary under Article 74, UCMJ, 10 U.S.C. § 874 (2006); and presidential approval or commutation of the capital sentence under Article 71(a), UCMJ. While the availability of these extra-judicial remedies may impact the res judicata effect of judgments under Article 76, UCMJ, 10 U.S.C. § 876 (2006), it does not change the fact that direct judicial review is complete.

In contrast with the direct judicial review authorized and dictated under Articles 66 and 67, UCMJ, and R.C.M. 1201-1205 and 1209, no statutory authority, guidance, or process for

5

collateral review by this Court exists once direct review has been completed.[2]  See Noyd v. Bond, 395 U.S. 683, 695 n.7 (1969) (distinguishing between this Court's power to issue a writ of habeas corpus in cases "like the present one [a case pending direct review], which may ultimately be reviewed by [the] Court" and "a case which the [Court] is not authorized to review under the governing statutes");[3] Burns v. Wilson, 346 U.S. 137, 141

---

[2] Nor does practice within the military justice system reflect a different understanding.  Since the current military justice system was created under the UCMJ in 1951, there have been twelve executions and fourteen death sentences that were affirmed on direct review but commuted by the President.  Dwight H. Sullivan, "Executive Branch Consideration of Military Death Sentences," Evolving Military Justice 137 (Eugene R. Fidell & Dwight H. Sullivan eds., 2002).  In no capital case other than this one has a writ of habeas corpus been sought in any court before the President approved the sentence.  (For cases in which a habeas petition was filed after presidential approval of the death sentence, see, for example, Thomas v. Davis, 249 F.2d 232 (10th Cir. 1957); Day v. Wilson, 247 F.2d 60 (D.C. Cir. 1957); and Suttles v. Davis, 215 F.2d 760 (10th Cir. 1954).)  And no military prisoner with a capital sentence -- including one prisoner currently facing a presidentially approved capital sentence -- has ever requested a writ of habeas corpus from this Court after direct review was completed, even after the President acted.  See Petitioner's Response to Motion for Reconsideration, To Lift Stay of Execution and Request for Oral Argument at 5, Gray v. Gray, No. 08-3289-RDR (D. Kan. Dec. 2, 2008) ("Private Gray is seeking federal habeas court review for the first time and he has not delayed commencing this action.  In fact, until the President approved his death sentence, there was no action available.").

[3] The latter part of this quotation is neither cited nor addressed by the majority.  And with respect to the part of the quotation that is cited, the majority fails to explain how, where direct review is completed, the fact that the President has not yet acted pursuant to Article 71(a), UCMJ, transforms this case into one where further review by this Court is authorized.  No review of presidential action under Article

6

(1953) (plurality opinion) (recognizing a petition for a new trial as the only mechanism within the military justice system, apart from ordinary appellate review, to collaterally attack a judgment); United States v. Murphy, 50 M.J. 4, 5-6 (C.A.A.F. 1998) (recognizing the absence of rules or procedures for post-conviction collateral attacks in the military justice system and thus reviewing an ineffective-assistance-of-counsel claim on direct review); Witham v. United States, 355 F.3d 501, 505 (6th Cir. 2004) ("[N]either the [UCMJ] nor the Manual for Courts-Martial provides for collateral review within the military courts."); Gilliam v. Bureau of Prisons, 2000 U.S. App. LEXIS 3684, at *4, 2000 WL 268491, at *2 (8th Cir. Mar. 10, 2000) ("'Unlike the practice in the United States Circuit Courts of Appeal and District Courts, neither the UCMJ . . . nor the Manual for Courts-Martial . . . provides procedures for collateral, post-conviction attacks on guilty verdicts.'" (quoting Murphy, 50 M.J. at 5)).

### B. Article III Courts Have Jurisdiction Over This Habeas Petition

Article III courts, though, have clear statutory jurisdiction and authority to collaterally review convictions by petitioners held in custody when constitutional error is

---

71(a), UCMJ, is provided for or authorized by any statute. Other than by ipse dixit, this case is not one that "may ultimately be reviewed by" this Court. Noyd, 395 U.S. at 695 n.7.

alleged.  See 28 U.S.C. § 1331 (2006) (providing Article III district courts with original jurisdiction over federal questions); id. § 2241(a) ("Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."); id. § 2241(c)(3) (extending writ of habeas corpus to prisoners "in custody in violation of the Constitution or laws or treaties of the United States"); Denedo, 129 S. Ct. at 2226 n.1 (Roberts, C.J., dissenting) (recognizing that court-martial convictions may be collaterally attacked in an Article III court, which has jurisdiction under §§ 1331 and 2241); Goldsmith, 526 U.S. at 537 n.11 (1999) ("[O]nce a criminal conviction has been finally reviewed within the military system, . . . [a servicemember] is entitled to bring a habeas corpus petition, see 28 U.S.C. § 2241(c), claiming that his conviction is affected by a fundamental defect that requires that it be set aside."); Burns, 346 U.S. at 139 (plurality opinion) (recognizing that the federal civil courts have jurisdiction over habeas corpus petitions and that "[b]y statute Congress has charged them with the exercise of that power" (citing § 2241; In re Yamashita, 327 U.S. 1, 8 (1946)).

And while the statutes are already clear regarding the court system to which a habeas corpus petition should be addressed after direct review is complete, it is further

instructive that Article III courts have been collaterally reviewing court-martial convictions where direct review has been completed since at least the mid-1800s.  See Ex parte Reed, 100 U.S. 13, 19-23 (1879) (entertaining a habeas corpus petition alleging that a military court-martial lacked jurisdiction over the petitioner).  Since that time, debate has focused not on to whom the writ should be addressed, but rather on the appropriate procedures, claims, and standards of review for collaterally attacking court-martial convictions in federal court.  See, e.g., Gusik v. Schilder, 340 U.S. 128, 131 (1950) (requiring exhaustion of military remedies before allowing collateral review in federal courts); Burns, 346 U.S. at 142 (plurality opinion) (recognizing collateral review of constitutional claims that have not been "fully and fairly" considered by the military justice system); Schlesinger v. Councilman, 420 U.S. 738, 749-53 (1975) (holding that Article 76, UCMJ, does not affect the jurisdiction of Article III courts or insulate military convictions from collateral review in federal court).  By comparison, only since the mid-1960s has this Court in any way asserted the power of collateral review over final convictions. See United States v. Frischholz, 16 C.M.A. 150, 152-53, 36 C.M.R. 306, 308-09 (1966) (holding that the All Writs Act empowers this Court to issue a post-conviction writ of coram nobis).

### C. The All Writs Act Cannot And Does Not Give This Court Jurisdiction Where None Exists Under Article 67, UCMJ

Despite the absence of express statutory jurisdiction to entertain a habeas corpus petition, this Court in 2005 found that it had such authority under the All Writs Act, 28 U.S.C. § 1651, based on our prior direct review jurisdiction under Article 67, UCMJ. Loving III, 62 M.J. at 245-46, 250; cf. Loving V, __ M.J. __ (7) (asserting that cases pending presidential action remain subject to extraordinary writ consideration by this Court). To do so, the Court distinguished Goldsmith, where the Supreme Court held that this Court erred by directing the Air Force not to drop a servicemember from its rolls (an administrative action), stating this Court was "not given authority, by the All Writs Act or otherwise, to oversee all matters arguably related to military justice." 526 U.S. at 536. The Loving III Court found Goldsmith inapplicable because unlike that case, it reasoned, Loving III involved a finding and sentence imposed by a court-martial that was not final under Article 76, UCMJ, such that the extraordinary relief requested would be in aid of the Court's direct review jurisdiction under Article 67, UCMJ. Loving III, 62 M.J. at 246.

But Article 76, UCMJ, does not change the fact that direct review is complete. Article 76, UCMJ, codifies the common-law principle of finality of judgments; it neither expands nor

contracts the subject-matter jurisdiction of either this Court, Denedo, 129 S. Ct. at 2221, 2223 (emphasizing that the principle that Congress decides federal courts' jurisdiction "applies with added force to Article I tribunals" and noting that Article 76, UCMJ, sets out a rule of finality rather than a jurisdictional bar), or Article III courts, Councilman, 420 U.S. at 749. See also Loving III, 62 M.J. at 247 (recognizing that the President's approval or commutation of the death sentence "is not part of the direct judicial review of the case").

Even more curiously, the Loving III Court explicitly recognized that it was empowered to act by neither the general federal habeas statute, § 2241, nor by any other congressionally enacted habeas corpus statute. 62 M.J. at 255 (noting that the plain language of §§ 2241 and 2255 did not include this Court). The Court nonetheless went on to determine that the All Writs Act -- a residual source of writ authority in aid of existing jurisdiction -- authorized it to issue the writ in aid of its former direct review jurisdiction. Id. at 256. See generally Article 67(a)(1), UCMJ (providing for mandatory review of "all cases in which the sentence, as affirmed by a Court of Criminal Appeals, extends to death").

Supreme Court precedent addressing this Court's authority under the All Writs Act, however, makes clear this holding was in error. Although the Supreme Court has confirmed that this

Court may sometimes issue writs under the Act, its interpretation of the scope of the Act and of our jurisdiction demonstrates that the Act does not authorize this Court to entertain a collateral attack through a habeas corpus petition that is not part of the direct review authorized by statute. See Noyd, 395 U.S. at 695 n.7 (noting that although there was no longer "any doubt as to the power of the Court of Military Appeals to issue an emergency writ of habeas corpus" under the All Writs Act, the power was recognized only for cases "which may ultimately be reviewed by th[e] court" and not cases "which the [court] is not authorized to review under the governing statutes").

In Goldsmith, the Supreme Court made it clear that jurisdiction on direct review of a court-martial conviction does not establish jurisdiction for all potential post-conviction remedies. 526 U.S. at 536. Reversing this Court's decision, the Supreme Court stated that this Court could not always "act as a plenary administrator even of criminal judgments it has affirmed." Id. (emphasis added). The Supreme Court noted our opinion "spoke too expansively" when it decided that former jurisdiction over the accused's court-martial conviction triggered the provisions of the All Writs Act. Id.

Likewise, in Denedo the Supreme Court reaffirmed that the authority granted under the All Writs Act "does not determine

12

the anterior question whether military courts have jurisdiction to entertain a petition for [extraordinary relief]." 129 S. Ct. at 2221. The Act itself is "not a source of subject-matter jurisdiction." Id. at 2222. Further, in holding that this Court could issue a writ of coram nobis under the facts of Denedo, the Supreme Court relied heavily on the nature of coram nobis as a "belated extension of the original proceeding during which the error allegedly transpired." Id. at 2221. A military court's jurisdiction to issue such a writ was thus derived from "the earlier jurisdiction it exercised to hear and determine the validity of the conviction on direct review." Id. at 2222.

Unlike the writ in Denedo, the relief requested by Loving -- a writ of habeas corpus -- is not appropriately entertained by this Court under the All Writs Act for three reasons. First, unlike a writ of coram nobis, habeas corpus is not a "belated extension" of the original court-martial proceeding. It is instead an entirely separate civil proceeding in which the petitioner asserts his rights against those who hold him in custody. See id. at 2221 ("[C]oram nobis is 'a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding.'" (quoting Morgan, 346 U.S. at 505 n.4)); Riddle v. Dyche, 262 U.S. 333, 335-36 (1923) ("The writ of habeas corpus is not a proceeding in the original criminal prosecution, but an

13

independent civil suit . . . ."); Ex parte Tom Tong, 108 U.S. 556, 559 (1883) ("The prosecution against [petitioner] is a criminal prosecution, but the writ of habeas corpus which he has obtained is not a proceeding in that prosecution.").

Second, even if a post-conviction habeas corpus petition fell within the ambit of this Court's All Writs Act authority as an extension of our Article 67, UCMJ, review (which it does not), entertaining such a petition is inappropriate in the present case because the All Writs Act is limited to circumstances where no other remedy is available. Goldsmith, 526 U.S. at 537 ("The All Writs Act invests a court with a power essentially equitable and, as such, not generally available to provide alternatives to other, adequate remedies at law."). Here, another remedy is available: a habeas corpus petition in an Article III court.

Despite recognizing that such a writ was an available remedy for military prisoners, the Loving III Court nonetheless went on to discount that remedy on the ground that Article III courts would, based on the doctrine of exhaustion, abstain from considering Loving's petition until the President approved Loving's death sentence. See 62 M.J. at 248-50; Loving V, __ M.J. __ (4-5). Lack of presidential approval notwithstanding, I do not believe the exhaustion doctrine prevents Article III review of Loving's petition. This Court decided in 2005 that

14

the possibility of clemency from the President is not part of

the direct judicial review process and, as such, is not an

available remedy sufficient to preclude issuing a writ of coram

nobis.[4]  Loving III, 62 M.J. at 247 ("We conclude that

presidential action is not an adequate remedy at law.

Presidential action is akin to a state governor's action, and as

such, is not part of the direct judicial review of the case.").

Our determination of what the UCMJ means receives great

deference in Article III courts.  Middendorf v. Henry, 425 U.S.

25, 43 (1976); see also Noyd, 395 U.S. at 694, 696.  It follows,

therefore, that the exhaustion doctrine would not necessarily

preclude those courts from hearing Loving's petition based on

the mere possibility of executive action.

But even if Article III courts chose to view presidential

approval of the sentence in a capital case as a necessary

predicate to exhaustion, that view would not necessarily deprive

those courts of review power.  The Supreme Court has made clear

that exhaustion is a prudential doctrine, not a jurisdictional

one; it remains subject to the circumstances of the case,

---

[4] Strangely, while holding that presidential action was an inadequate remedy to preclude a writ of coram nobis -- which may only be filed in the absence of any other remedy, see, e.g., Denedo, 129 S. Ct. at 2220 -- this Court went on to determine that the same presidential action was an adequate-enough remedy to prevent Article III judicial review under the principle of exhaustion -- which also requires that there be no other remedy, Gusik, 340 U.S. at 131-32.  Loving III, 62 M.J. at 247, 249-50. This purported distinction makes no sense.

including the potential for long delay.[5] See Boumediene v. Bush, 128 S. Ct. 2229, 2275 (2008) (refusing to apply the exhaustion doctrine in cases where petitioners faced "months, if not years, of delay"); see also Denedo v. United States, 66 M.J. 114, 122 (C.A.A.F. 2008) (acknowledging that the Supreme Court has not precluded "the possibility that the circumstances of a particular case might warrant consideration of a habeas petition by an Article III court prior to exhaustion." (citing Councilman, 420 U.S. at 761)). Thus, an Article III court could choose to hear a military prisoner's habeas petition in light of significant potential delay in presidential action.[6]

Finally, the usual canon of statutory construction that favors specific statutes over general ones suggests that the All Writs Act cannot be asserted to extend our Article 67, UCMJ, jurisdiction in the face of specific habeas corpus statutes. See Hinck v. United States, 550 U.S. 501, 506 (2007) (repeating

---

[5] Of course, the doctrine of exhaustion is prudential in part because of principles of comity and, relatedly, because remedies not yet asserted may moot the question being considered by a collaterally reviewing court. Councilman, 420 M.J. at 756-57.

[6] Regardless, there is little reason to believe that a military prisoner who has been sentenced to death will seek habeas corpus relief before presidential approval, which provides its own delay, given the natural interest a prisoner has in delaying his execution. See Dwight H. Sullivan, The Last Line of Defense: Federal Habeas Review of Military Death Penalty Cases, 144 Mil. L. Rev. 1, 5 n.13 (1994) ("Because death row inmates have an obvious interest in delay of any kind, no service member under a military death sentence would have an incentive to seek habeas relief before presidential action on the sentence.") (citation omitted).

"the well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies'" (quoting EC Term of Years Trust v. United States, 550 U.S. 429, 434 (2007)). "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." Penn. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 43 (1985) (emphasis added). Even if we were to ignore the plain language of Article 67, UCMJ, and assume a theoretical continuing jurisdiction over capital cases in which we once had jurisdiction, such as that advanced by the Loving III Court, see 62 M.J. at 244 ("[W]e conclude that this Court's subject matter jurisdiction continues even after the Supreme Court's decision affirming Petitioner's death sentence."), the fact remains that Article 67, UCMJ, provides only a general grant of authority, and the All Writs Act provides only a broadly defined mechanism to issue writs in aid of already-existing jurisdiction.

In contrast, Article III habeas corpus power is set down in reticulated statutes detailing not only which courts have the authority to issue writs of habeas corpus, 28 U.S.C. § 2241 (2006), but also specifics related to, inter alia, the form, timing, filing, standards of review, and statutes of limitation

17

for such writs, 28 U.S.C. §§ 2241-55 (2006).[7]  Thus, even if the Court's statutory jurisdiction could be stretched as far as the majority assumes, this Court may not entertain Loving's petition because an Article III court could properly consider a military prisoner's habeas corpus petition and the All Writs Act does not allow this Court to act in the face of another, specific statute.  See Goldsmith, 526 U.S. at 537.[8]

### III.  This Court's Foray Into Habeas Corpus Law Helps Neither This Nor Future Petitioners

I do not doubt that Loving sought a writ of coram nobis here in 2005 because there was presumably nothing to lose.  If we entertained it, there was a possibility we would afford him relief.  If we refused to entertain it, he was presumably no worse off.  But we proposed he file a habeas petition, and, with the Court's judgment today, he is afforded no relief and is worse off if the judgment is allowed to stand.

---

[7] Which is not to suggest that these reticulated statutes apply perfectly to the review of military courts-martial.  But any difficulty in Article III courts' habeas review of courts-martial convictions neither divests them of jurisdiction to conduct such review, nor gives this Court authority to expand its own jurisdiction.  It is for Congress to change the who and the how of habeas review, not this Court.

[8] This seems all the more obvious where, as here, the legal issue is not one that turns on any interpretation of military law or nuance of military service, but rather presents the constitutional claim of ineffective assistance of counsel -- a claim with which Article III courts are at least as familiar as this Court.

And Loving has no incentive to let the judgment stand.[9] The Court's 2005 expansion of jurisdiction beyond the statutory limits established by Congress was not only unnecessary, given the statutory availability of recourse to an Article III court, but unfortunate. First, we have hastened post-conviction collateral review of a habeas corpus petition in a capital case before the President has acted to approve the sentence. See supra note 6.

Second, we have foreclosed initial review of Loving's habeas corpus petition by an Article III court on this claim, potentially placing him in the unenviable position of being a successive petitioner. Congress has moved to limit habeas corpus by restricting successive petitions presenting the same claims:

No circuit or district judge shall be required to

---

[9] Even though Loving now has every incentive to challenge this judgment, we ought not to wait for such a challenge; it is our responsibility to ensure we have jurisdiction, not his. See, e.g., Ashcroft v. Iqbal, 129 S. Ct. 1937, 1945 (2009) ("Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt."); Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Moreover, courts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." (citation and quotation marks omitted)); United States v. Cotton, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court.").

> entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

28 U.S.C. § 2244(a).  If an Article III court concludes that this Court, the United States Court of Appeals for the Armed Forces, is "a court of the United States" under § 2244, the Article III court would not be required to hear the petition. See Loving V, __ M.J. __ (7) (recognizing "the potential effect of a habeas petition before our Court on future habeas petitions filed in the Article III courts").

Third, in light of the above, the standard of review indiscriminately plucked[10] by this Court to review habeas corpus challenges to our own prior decisions is especially cold comfort to Loving.  See Loving IV, 64 M.J. at 145 (adopting the standard of review from 28 U.S.C. § 2254 (2000), which, in part, restricts Article III court review of a state proceeding to whether the state decision was contrary to or an unreasonable application of federal law); accord Loving V, __ M.J. __ (8).

---

[10] Other than asserting its jurisdiction to entertain this habeas petition and selecting its own standard of review, this Court elected not to provide any further guidance to future petitioners as to when and how they should approach us with their claims.  Habeas corpus unmoored from any procedural rules and provisions is a novelty, to say the least.  The Court failed to consider the prudence of asserting jurisdiction and adopting a standard of review in a vacuum.

Deference to state court decisions under § 2254 reflects the need to balance federal review against respect for proceedings conducted by a separate sovereign -- the state.  See Williams v. Taylor, 529 U.S. 420, 436-37 (2000) (discussing § 2254's deference to state court proceedings).  Such deference is inexplicable and inappropriate when this Court reviews its own prior holdings.  A petitioner seeking collateral review of his court-martial at this Court faces the unusual and uphill battle of convincing us that our own previous actions were not just erroneous, but unreasonable.

While such deference may or may not be warranted when an Article III court is reviewing a decision of this Court, it seems untoward to apply it to our own previous decisions.  Most people -- a category that arguably includes most judges -- would not have adopted a position in the first instance if they thought it was unreasonable.

## IV.  Conclusion

The writ of habeas corpus is "the most celebrated writ in English law," William Blackstone, 3 Commentaries 129 (1768), and I do not begrudge Loving's desire to exercise his constitutional right to challenge on collateral review the alleged ineffective assistance of counsel he received at his capital trial.[11]  But

---

[11] Further, while I take issue with this Court's continued expansion of its own jurisdiction beyond the limits established

absent statutory changes from Congress, the appropriate venue

for review of this petition is the Article III courts.

Therefore, I respectfully dissent.

---

by Congress, this Court could provide an adequate venue to evaluate Loving's conviction <u>if</u> the UCMJ provided jurisdiction over cases in which direct review is completed (preferably with related procedural guidance, in the case of habeas petitions) and <u>if</u> the U.S. Code did not already invest jurisdiction over these cases in Article III courts. Whatever its beginnings, far from being "a rough form of justice," <u>Reid v. Covert</u>, 354 U.S. 1, 35 (1957), the military justice system today, including this Court, generally provides "substantial procedural protections and provision for appellate review by independent civilian judges [to] 'vindicate servicemen's constitutional rights.'" <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 586 (2006) (quoting <u>Councilman</u>, 420 U.S. at 758). This is confirmed by the extensive and careful review received in this case to date. <u>See</u> <u>United States v. Loving</u>, 34 M.J. 956 (A.C.M.R. 1992) (direct appeal); <u>United States v. Loving</u>, 34 M.J. 1065 (A.C.M.R. 1992) (petition for reconsideration); <u>United States v. Loving</u>, 41 M.J. 213 (C.A.A.F. 1994) (mandatory direct review); <u>United States v. Loving</u>, 42 M.J. 109 (C.A.A.F. 1995) (petition for reconsideration); <u>Loving v. Hart</u>, 47 M.J. 438 (C.A.A.F. 1998) (petition for writ of mandamus to CCA); <u>Loving v. United States</u>, 62 M.J. 235 (C.A.A.F. 2005) (petitions for writ of coram nobis); <u>Loving v. United States</u>, 64 M.J. 132 (C.A.A.F. 2006) (petition for writ of habeas corpus). But the fact that this Court may be competent to adjudicate Loving's constitutional claim does not answer the antecedent question whether Congress has authorized it to do so once direct review is completed.